WALBORG CORPORATION, peticionaria, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. LUIS V. CASTRO, JUEZ, demandado.

*Número:* O-75-278 *Resuelto:* 30 de septiembre de 1975

*Morales, Cordero & Lugo,* abogados de la peticionaria; *José A. Gallart* y *Edgardo A. González,* abogados del interventor José A. Vigo.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El señor José A. Vigo acordó en 1969 encargarse de la distribución en Puerto Rico de los productos de Walborg

Corporation. En agosto de 1974 el distribuidor radicó demanda ante el Tribunal Superior por razón de la terminación unilateral del contrato por Walborg en violación de las disposiciones de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278 *et seq.* Walborg solicitó la desestimación del recurso, alegando que la controversia debía someterse a arbitraje conforme a las disposiciones del convenio entre las partes.

El contrato de distribución, representado por una carta que Walborg le remite al señor Vigo y que éste suscribe, contenía la cláusula siguiente:

". . . this contract is made and shall be interpreted under the laws of the State of New York, and any controversy arising under or in relation to this contract shall be settled by arbitration to be held in the City of New York, in accordance with the law of the State of New York and the rules then obtaining of the American Arbitration Association, Commercial Tribunal, or its successor, and the parties consent to the jurisdiction of the Supreme Court of said State and further consent that any process or notice of motion or other application to the Court or a Judge thereof or any other application or notice in said arbitration proceedings may be served outside the State of New York by registered mail or by personal service, provided a reasonable time for appearance is allowed and the judgment may be entered upon the award of the arbitrators in any court of competent jurisdiction."

El Tribunal Superior declaró la moción sin lugar. Walborg recurre en petición de *certiorari.*

## I

La primera cuestión que plantea esta situación de hechos es precisar el nexo entre nuestra ley local de arbitraje, 32 L.P.R.A. sec. 3201 *et seq.*, y la citada Ley Núm. 75. Como expresamos en *McGregor-Doniger* v. *Tribunal Superior*, 98 D.P.R. 864, 869 (1970), "Existe una política vigorosa en

favor del arbitraje. . . ." No fue siempre así. Por siglos existió hostilidad decidida por parte de los tribunales a permitir el desarrollo del recurso arbitral. Sturges y Murphy, *Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act,* 17 Law & Contem. Prob. 580 (1952) ; H. Rep. No. 96, 68° Cong., 1ª Ses. 1, 2 (1924).

■ Reiteramos que el arbitraje constituye un medio extremadamente valioso para resolver controversias en una sociedad. Merece el más decidido apoyo y aliento. No representa, sin embargo, una política pública de orden absoluto, ante la cual tenga que doblegarse por fuerza toda otra política pública.

■ Determinadas leyes pueden encarnar valores de tal importancia para un país que algunas o aun todas las controversias debidas a su impacto tengan que ser declaradas no susceptibles de arbitraje, al menos bajo determinadas cláusulas. La existencia de una cláusula de arbitraje no nos exime en fin, del antiguo deber judicial de sopesar los intereses en pugna reflejados por legislaciones distintas, como tampoco de la obligación de impedir el deterioro del arbitraje en mecanismo de evasión de mandatos legislativos vitales.

Así se reconoce por el Tribunal Supremo de Estados Unidos. En *Wilko* v. *Swan,* 346 U.S. 427 (1953), citado con aprobación en *Autoridad sobre Hogares* v. *Tribunal Superior,* 82 D.P.R. 344, 356 (1961), se trataba de un contrato de compra de valores con cláusula arbitral. La Sec. 14 de la Ley de Reglamentación de Valores de 1933 prohíbe toda estipulación en tal género de contratos que obligue a un comprador a renunciar los derechos que la ley le garantiza. El Tribunal se negó a suspender los procedimientos y a ordenar el arbitraje bajo la ley federal relativa a dicha materia. 43 Stat. 883; 9 U.S.C.A. sec. 3. Estimó el Tribunal que el derecho a seleccionar el foro es parte de las estipulaciones que no pueden ser renunciadas. Consideró asimismo que la gran desventaja

188

en que usualmente se encuentran los compradores en estos casos convierten las cláusulas de arbitraje en estratagemas evasivas.

Se ha determinado también que la política encarnada en el título VII de la Ley de Derechos Civiles pesa más que la política a favor del arbitraje. *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36 (1973). Para otras instancias en que se ha descartado judicialmente el arbitraje, por requerirlo valores más altos, véanse: *American Safety Equipment Corp.* v. *J. P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968); *A. & E. Plastik Pak Co.* v. *Monsanto Co.*, 396 F.2d 710 (9th Cir. 1968); *Aimcee Wholesale Corp.* v. *Tomar Products, Inc.*, 237 N.E.2d 223 (N.Y. 1968); *cf. Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506 (1973).

La Ley Núm. 75 de 1964 se aprobó con el propósito expreso de proteger a los distribuidores locales contra prácticas indebidas por parte de los manufactureros. Este problema es actualmente en Estados Unidos motivo de preocupación intensa. Brown, *Franchising: Fraud, Concealment and Full Disclosure*, 33 Ohio St. L.J. 517 (1972). El informe de la Comisión concernida señala las razones que movieron al legislador puertorriqueño:

"Recientemente se ha recrudecido el problema creado en el sistema de distribución en Puerto Rico por la acción intempestiva de empresas manufactureras domésticas y del exterior que, sin causa justificada, dan por terminadas sus relaciones con sus distribuidores y agentes en Puerto Rico, tan pronto como éstos han creado un mercado favorable para sus productos, frustrando las legítimas expectativas e intereses de los que tan eficientemente han cumplido con sus responsabilidades.

. . . . . . . .

Las disposiciones tradicionales que regulan los contratos entre particulares han demostrado no ser eficaces para proteger los legítimos derechos del distribuidor o agente, por lo que se hace necesario legislar para reglamentar esta relación y garantizar que los manufactureros actúen de buena fé, equitativamente, de manera no arbitraria, y preservar al distribuidor o

agente los derechos y las expectativas justificadas inherentes a la relación. Además, esto tendrá la consecuencia de dar estabilidad a las relaciones de distribución."

En la Exposición de Motivos de la Ley Núm. 75 se afirmó:

"El Estado Libre Asociado de Puerto Rico no puede permanecer indiferente al creciente número de casos en que empresas domésticas y del exterior, sin causa justificada, eliminan sus distribuidores, concesionarios, o agentes, o sin eliminarlos totalmente van gradualmente mermando y menoscabando el alcance de las relaciones previamente establecidas, tan pronto como dichos distribuidores, concesionarios o agentes han creado un mercado favorable y sin tener en cuenta sus intereses legítimos.

'La Asamblea Legislativa de Puerto Rico declara que la razonable estabilidad en las relaciones de distribución en Puerto Rico es vital a la economía general del país, al interés público y al bienestar general, y en el ejercicio del poder policial, considera necesario reglamentar, en lo pertinente, el campo de dichas relaciones, para evitar los abusos que ciertas prácticas ocasionan.' "

No cabe duda de la alta prelación asignada por la Asamblea Legislativa a los valores representados por esta Ley. Adviértase que en su Art. 4 se declara que los derechos que esta ley garantiza son de orden público y, como en *Wilko*, irrenunciables. La Ley Núm. 75 representa incuestionablemente una fuerte política pública encaminada a nivelar las condiciones de contratación de dos grupos económicamente dispares en su fuerza. Lejos de atenuar su efecto en ocasión alguna, la Asamblea Legislativa de Puerto Rico lo ha reforzado en vez, estatuyendo que "en la adjudicación de las reclamaciones que surjan a su amparo, *los tribunales de justicia* reconocerán los referidos derechos a favor de quien efectivamente tenga a su cargo las actividades de distribución, no empece las estructuras o mecanismos corporativos o contractuales que el principal o concedente pueda haber creado o impuesto para encubrir la verdadera naturaleza de la relación establecida." (Bastardillas nuestras.) Ley Núm. 105 de

23 de junio de 1966, Art. 2. Véase: *Warner Lambert Co.* v. *Tribunal Superior*, 101 D.P.R. 378 (1973).

 A la luz de estos hechos, estimamos que no puede concedérsele a la cláusula de arbitraje acordada en este caso mayor fuerza que a la política representada por la Ley Núm. 75. Los derechos que la Ley Núm. 75 les confiere a los distribuidores son, además, irrenunciables por declaración expresa de la Asamblea Legislativa. Ello significa, tal como se expresó en *Wilko*, que no puede renunciarse el derecho que por necesidad tiene el distribuidor, para el funcionamiento debido del esquema protector de la ley, de seleccionar el foro para la ventilación de sus quejas. La cláusula que nos ocupa representa también a todas luces un mecanismo para evadir la aplicación al contrato aquí envuelto de la Ley 75. *Wilko* v. *Swan,* 346 U.S. 427, 435 (1953). La propia Ley Núm. 75 ordena por último, como hemos visto, que *los tribunales de justicia* reconozcan y protejan los derechos que ella confiere. No procede, por tanto, bajo la ley local suspender los procedimientos judiciales en este caso.

## II

 Debemos examinar, en segundo término, el efecto sobre este litigio de la ley federal de arbitraje. 61 Stat. 669, 9 U.S.C.A. sec. 1 *et seq.* Esta ley se aplica tan sólo a transacciones en el comercio interestatal. *Bernhardt* v. *Polygraphic Co.,* 350 U.S. 198 (1956). Tal es el caso presente.

 En *Hilti, Inc.* v. *Oldach*, 392 F.2d 368 (1st Cir. 1968), *Sumaza* v. *Cooperative Association*, 297 F.Supp. 345 (D.P.R. 1969) y otros casos se ha resuelto que procede bajo la ley federal la suspensión de procedimientos fundados en la Ley Núm. 75 y que envuelvan el comercio interestatal hasta que se celebre el arbitraje, cuando las partes así lo han acordado. ¿Significa esto que la ley federal de arbitraje obliga a las cortes estatales a resolver de igual modo?

La cuestión no ha recibido hasta ahora respuesta definitiva por parte del Tribunal Supremo de Estados Unidos. En *Prima Paint* v. *Flood & Corklin*, 388 U.S. 395 (1966) (Fortas), el Tribunal señaló que la ley federal de arbitraje gobierna la conducta de los tribunales federales, pero se abstuvo cuidadosamente de pronunciarse sobre su efecto en otras cortes, asunto que no estaba ante su consideración. Véase: Bernstein, *Private Dispute Settlement*, MacMillan Co., 1968, págs. 671-672. Otros tribunales se han expresado sobre el particular, pero existe diversidad de criterios. En *Pullman Incorporated* v. *Phoenix Steel Corporation*, 304 A.2d 334 (Del. 1973), por ejemplo, se resolvió que los tribunales estatales no vienen obligados a aplicar la ley federal. En *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.*, 271 F.2d 402 (2d Cir. 1959) y *Pinkis* v. *Network Cinema Corp.*, 512 P.2d 751 (Wash. 1973), se resolvió lo contrario.

Favorecemos la doctrina de *Pullman* por varias razones. El propio lenguaje de la ley federal apoya el enfoque de que sus disposiciones sientan normas de acción tan sólo para los tribunales federales. La Sec. 3 opera solamente "Si se incoa cualquier causa o procedimiento en cualquiera de las cortes *de los Estados Unidos*". (Traducción y bastardillas nuestras.) Nótese también las limitaciones comparables que se insertan en las Secs. 4 y 7. Bernstein, *op. cit.*, 672.

El esquema representado por la ley federal de arbitraje no obedece, a nuestro juicio, a consideraciones de tal rango que requieran uniformidad de tratamiento por otras unidades políticas o exijan que los valores que dicha legislación encarna predominen en toda circunstancia concebible sobre valores locales de alta prelación. El gran mérito del federalismo norteamericano reside en el ancho campo que le reserva a la iniciativa local, limitando el requerimiento de uniformidad para las cuestiones verdaderamente esenciales a la supervivencia y enriquecimiento de la unidad de sus componentes políticos. No entendemos que el arbitraje comercial, en cual-

quiera de sus manifestaciones, requiera un enfoque uniforme. No es éste el caso, por ejemplo, de la aplicación por las cortes de los estados de cláusulas de arbitraje bajo la Sec. 301 de la Labor Management Relations Act. *Teamsters, Chauffeurs, Warehousemen & Helpers, Local 174* v. *Lucas Flour Co.,* 369 U.S. 95 (1962) ; *Steelworkers* v. *Warrior Gulf Co.,* 363 U.S. 574 (1959). Poderosas consideraciones apoyan la uniformidad en el arbitraje laboral, especialmente fundadas en su condición de eficaz sustituto de las guerras industriales. Véase la distinción que al efecto se establece en *Steelworkers,* 578, entre el arbitraje laboral y el comercial. No hallamos razones comparablemente persuasivas para llegar al mismo resultado en la situación de autos.

A la luz de las conclusiones a que hemos llegado en esta segunda parte, no es necesario, por supuesto, examinar el impacto sobre este caso de la relación especial entre Puerto Rico y Estados Unidos.

### III

■ Queda por resolver el problema del efecto del acuerdo de las partes sobre la ley aplicable, asumiendo, para fines de argumentación, su separabilidad del problema planteado por la cláusula de arbitraje. Las cláusulas en que se escoge la ley se consideran válidas usualmente cuando la jurisdicción seleccionada tiene contactos sustanciales con el contrato. Leflar, *American Conflicts Law,* ed. rev. 1968, secs. 145–148; Griswold, Cheatham, Reese & Rosenberg, *Conflict of Laws,* 5ª ed. 1964, pág. 543 *et seq.* Dichas cláusulas son ineficaces, sin embargo, cuando chocan contra consideraciones fundamentales de orden público del foro. Goodrich, *Conflict of Laws,* 4ª ed. (Scoles), 1964, pág. 202; 1 *Restatement of the Laws, Second, Conflict of Laws,* 1971, sec. 187; Ehrenzweig, *A Treatise on the Conflict of Laws,* 1962, sec. 176, págs. 468–469. *Maryland Cas'y Co.* v. *San Juan Racing Assoc., Inc.,* 83 D.P.R. 559, 567 (1961).

■ ▇ No cabe duda, a la luz de lo expuesto en la primera parte de esta opinión, que la cláusula aquí envuelta, seleccionando las leyes de Nueva York, contraviene una política pública considerada claramente de índole fundamental por la Asamblea Legislativa de Puerto Rico. Se derrotaría tal política pública si se aplicase en este caso la ley de Nueva York, donde no existe legislación comparable a la Ley Núm. 75.

▇ Siendo inválido el acuerdo de las partes respecto a la ley a regir procede en consecuencia aplicar la ley de la jurisdicción con los contactos dominantes con la transacción. *Maryland Cas'y*, supra; Leflar, *op. cit.*, 364–367; Goodrich, *op. cit.*, 204. Tal jurisdicción es Puerto Rico en la actual situación de hechos. La ejecución y el cumplimiento del contrato habrían de efectuarse aquí. El contrato, además, se efectuó por correspondencia, en cuyo caso la doctrina establece que el lugar de contratación es el sitio—Puerto Rico de nuevo en esta instancia—donde se echó al correo la aceptación. Goodrich, *supra*, 204.

## IV

▇ Por los fundamentos expuestos *se confirmará la resolución del Tribunal Superior, denegando la moción de desestimación radicada por la peticionaria*. Se revocan por tanto los pronunciamientos en contrario efectuados en *McGregor-Doniger* v. *Tribunal Superior*, supra.

Aunque después de *Warner Lambert Co.* v. *Tribunal Superior*, supra, *McGregor-Doniger* se hubiese resuelto de modo distinto, por tratarse allí de un contrato anterior a la fecha de vigencia de la Ley Núm. 75, consideramos, no obstante, que, por poderse haber otorgado contratos basados en la doctrina de *McGregor-Doniger*, razones de equidad aconsejan que declaremos que las normas sentadas en el caso de autos tendrán solamente efecto prospectivo. *Great Northern Railway* v. *Sunburst Oil & Refining Co.*, 287 U.S. 358 (1932); *Johnson and Cassidy* v. *New Jersey*, 384 U.S. 719

(1966); Mishkin, *The Supreme Court: 1964 Term—Foreword, The High Court, The Great Writ and Due Process of Time and Law,* 79 Harv. L. Rev. 56 (1965); *Pueblo* v. *Cruz Jiménez,* 99 D.P.R. 565 (1971).

El Juez Asociado, Señor Martín, concurre en el resultado sin opinión.