**RE–ACE, INC. Plaintiff**

v.

**WHEELED COACH INDUSTRIES, INC.; Bill de Leon Specialty Vehicles, Inc. Defendants**

**No. CIV 03–1285 CCC/CAG.**

United States District Court, D. Puerto Rico.

June 24, 2003.

Alfredo Fernández–Martínez, Esq., Delgado & Fernández, LLP, San Juan, PR, for Plaintiff.

Eyck O. Lugo–Rivera, Esq., Martínez, Odell & Calabria, San Juan, PR, for Defendants.

## OPINION AND ORDER

GELPI, United States Magistrate Judge.

Plaintiff, Re–Ace, a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, brings the present action against defendants, Wheeled Coach Industries, Inc., a corporation organized and existing under the laws of the State of Florida and Bill de Leon Specialty Vehicles, Inc.[1] Plaintiff alleges violations of Act No. 75 of June 24, 1964, P.R. Laws Ann. tit 10 § 278 *et seq.* ("Act 75") against Defendant Wheeled Coach Industries, Inc. (Docket No. 1). Plaintiff moved for preliminary injunctive relief re-

---

1. Wheeled Coach argued during the preliminary injunction hearing that Re–Ace was a corporation not in "good standing" in the Department of State of Puerto Rico for failing to file several annual reports. Nothing in the Puerto Rico Corporations Law precludes Re–Ace from filing this action and seeking equitable remedies. As of today, Re–Ace fully enjoys its corporate existence, although it may be subject to a fine for failing to file its annual reports. *See* P.R. Laws Ann. tit. 14 § 2302.

In addition, for purposes of the preliminary injunction stage of this Act 75 case, the only defendant that has appeared is Wheeled Coach Industries, Inc., as the party who contracted with Plaintiff Re–Ace. Plaintiff's cause of action against Bill de Leon Specialty Vehicles, Inc. is for the alleged tortious interference with the contractual relationship between Re–Ace and Wheeled Coach Industries, Inc. .

instating the contractual relationship between the parties, under the provisions of Act 75. (Docket No. 2). Defendant, Wheeled Coach Industries, Inc. opposed the request for preliminary injunction. (Docket No. 12). The preliminary injunction hearing was held on May 13, 2003.[2] After the preliminary injunction hearing was held the Court requested that both parties file memoranda with regards to the preliminary injunction request and they did. (Docket Nos. 30 and 31). Afterwards, the Court ordered the parties to file supplemental memoranda on additional issues. (Docket No. 32). Both parties filed their respective briefs and the Court held that this was the proper venue to entertain this action. (Docket Nos. 33, 34 and 35).

## I. *Factual Synopsis*

During the preliminary injunction hearing, Re–Ace's President, Mr. Carlos Leal, testified that Re–Ace has been in the business of distributing and selling different types of equipment, specialized trucks and vehicles since 1978. *Transcript,*[3] *page. 9, lines 13–17.* On the other hand, Wheeled Coach is engaged in the business of manufacturing ambulances and rescue vehicles, purportedly making 2,000 ambulances a year or 40% of the United States relevant market. *Transcript, page 10.* The only testimony the Court heard during the pre-

liminary injunction hearing describing the relationship between Re–Ace and Wheeled Coach Industries, Inc. from 1979 until late 2000 was that of Mr. Leal.[4] Re–Ace established its relationship with Wheeled Coach in 1979 when, according to Mr. Leal, "a bid was requested by the City of San Juan for nine rescue ambulances and I [Carlos Leal] contacted a friend in the United States who knew Wheeled Coach, knew the Collins family personally." *Transcript, pages 9–10.* At the time the relationship between the parties began, Wheeled Coach was not doing any business in Puerto Rico. *Transcript, page 9, lines 12–13.* According to Mr. Leal, at the time no new U.S. manufactured ambulances were sold in Puerto Rico. *Transcript, page 11, lines 5–8.*

After the initial bid in 1979, Mr. Leal testified that Re–Ace continued, without interruption, selling Wheeled Coach's ambulances in Puerto Rico. Mr. Leal testified that Re–Ace requested the distribution rights for Puerto Rico and the Virgin Islands. Yet, according to his testimony, Wheeled Coach only granted Re–Ace the distribution rights for Puerto Rico. *Transcript, page 11, lines 17–20, page 12, lines 1–6.*

For 24 years, since the relationship between the parties began, according to Mr. Leal, Re–Ace has sold approximately more

2. Both parties submitted to the Court an executed copy of the *Notice of Availability of a United States Magistrate Judge to Exercise Jurisdiction* and the district court ordered that the case be referred to the undersigned Magistrate Judge to conduct all proceedings and order entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

3. The transcript of the preliminary injunction hearing has been made part of the record (Docket No. 25).

4. Mr. Abel del Río, the only witness presented by defendant, Wheeled Coach Industries, Inc., during the preliminary injunction hearing ad-

mitted that before "late 2000" he had no personal knowledge of Re–Ace's contract with Wheeled Coach. *Transcript, page 166.* Thus, the Court relies on Mr. Leal's uncontested testimony to describe the relationship between the parties during that period of time. After late in the year 2000, Mr. Del Río testified that he was named International Sales Manager and made efforts to find out about the nature of the relationship between Wheeled Coach Industries, Inc. and Re–Ace. He found out that Re–Ace was Wheeled Coach's distributor in Puerto Rico and that there were no other Wheeled Coach distributors in Puerto Rico. *Transcript, pages 165–167.*

than 400 of Wheeled Coach's ambulances in Puerto Rico. *Transcript, page 11, lines 21–25.* Re–Ace and Wheeled Coach continued operating based on an oral contract. In 1989, Re–Ace and Wheeled Coach executed a written Distributor's Contract drafted in Wheeled Coach's form. *Transcript, page 12, lines 7–10.*[5]

During his testimony, Mr. Carlos Leal described the relationship between Re–Ace and Wheeled Coach from 1979 to 1989, as follows:

"I would continue to sell ambulances. We continued to sell ambulances of all types and there are various types of ambulances.

I would say that slowly we started getting into the municipal market, rather than just the big city, San Juan, which I consider a special case.

The difficulty was in introducing in Puerto Rico the federal specifications for an ambulance. They're called the KKK–1822 specifications and the federal standard for a minimum ambulance which should be utilized by ambulance purchasers. [ . . . ]

So, after that the federal ambulances started being much more acceptable as to the price."

*Transcript, pages 12 (lines 11–25) –13 (lines 1–16).*

During the period of time from 1979 to 1989, there were no other distributors in Puerto Rico for Wheeled Coach's ambulances, other than Re–Ace. *Transcript, page 13, lines 17–19.* At the time, Re–Ace was paid in two different ways. Either Re–Ace produced a letter of credit to Wheeled Coach before the ambulance left the manufacturing plant to Puerto Rico or Re–Ace used its own funds or the customer's funds to pay for the ambulance.

*Transcript, pages 13 (lines 22–25) and 14 (lines 1–5).*

In its relationship with Wheeled Coach and its distribution business, Mr. Leal testified that Re–Ace's clients are mostly the 78 municipalities of Puerto Rico, the Puerto Rico General Services Administration, the Puerto Rico Department of Corrections, the Puerto Rico Electric Power Authority, and, the Puerto Rico Telephone Company, among others. *Transcript, page 15 (lines 8–24).*

During the same period of time, Wheeled Coach recognized Re–Ace for its good performance with a dealership award, and delivered a plaque as a Wheeled Coach authorized dealer. *See* plaintiff's Exhibits 1 and 2 (Docket No. 24). According to Mr. Leal, Wheeled Coach gave Re–Ace other verbal recognitions at national sales meetings. *Transcript, page 16 (lines 1–25).* The plaque identifies Re–Ace as a Wheeled Coach Authorized Dealer, to show customers Re–Ace's authority as a Wheeled Coach dealer in Puerto Rico and as a symbol of recognition. *Transcript, page 17, lines 5–25.* In 1991, Mr. Mark Granonem (phonetic), Wheeled Coach's General Sales Manager at the time, gave Re–Ace, another plaque because of a successful campaign where 32 ambulances were sold. *Transcript, page 18, lines 13–11.* At the time, still there were no other distributors in Puerto Rico for Wheeled Coach. *Transcript, page 18, lines 17–25.*

In 1989, Wheeled Coach sent Re–Ace an executed Exclusive Distributor's Agreement. Re–Ace signed the contract which has been in effect ever since. *Transcript, page 19, lines 10, page 20, lines 24–25; plaintiff's Exhibit 3.* The terms of the agreement were not negotiated by Re–Ace but were acceptable because Re–Ace was

---

**5.** This contract was admitted into evidence at the preliminary injunction hearing as plain-  tiff's Exhibit 3.

granted, in writing, the exclusive distribution rights for Wheeled Coach's ambulances in Puerto Rico. *Transcript, page 21, lines 4–8.* Mr. Ronald Cartwright (phonetic), then President of Wheeled Coach, signed the exclusive distribution agreement on behalf of Wheeled Coach. *Transcript, page 21, lines 12–19.* The 1989 contract has never been revoked or cancelled by either party up to the actions that gave rise to this case. *Transcript, page 22, lines 1–4.*

After 1989, Re–Ace did business in Puerto Rico based on the terms of the 1989 exclusive distribution agreement executed with Wheeled Coach. *Transcript, page 22, lines 5–7.* In the distribution relationship with Wheeled Coach, Re–Ace promotes and closes the sales contract. *Transcript, pages 24, lines3–5.* Although Re–Ace has never kept an inventory of Wheeled Coach's vehicles in Puerto Rico, Mr. Leal explained that the reason is to avoid paying an excise tax on a vehicle that would not be sold because the government clients in Puerto Rico only purchase new ambulances and every ambulance sold has its own completely different separate set of specifications. *Transcript, pages 25–27.* Moreover, Wheeled Coach has never requested Re–Ace to keep an inventory of its ambulances in Puerto Rico. *Transcript, page 27, lines 13–20.*

In its relationship with Wheeled Coach, Re–Ace exercises control over the prices of the ambulances that are sold in Puerto Rico since the final sales price to Re–Ace's clients is exclusively set by Re–Ace. *Transcript, page 27–28.* In addition, Re–Ace sets the sales price for the ambulances depending on the competition, limiting or extending its profit on each sale. *Transcript, pages 28–29; 170.* Mr. Leal also testified, and his testimony was corroborated by Mr. Abel del Río, that Wheeled Coach has never participated in the submittal of bids for the sale of ambulances in

Puerto Rico nor entered into any contract in Puerto Rico for the sale of its ambulances. *Transcript, pages 181, 30, lines 10–16.* Re–Ace is the party who asks Wheeled Coach to make the transfer of the title and vehicle registration of the ambulances to the name of its clients. *Transcript page 181.*

Furthermore, Re–Ace is the party responsible to its clients for the delivery of the ambulances and, thus, informs Wheeled Coach of the date when delivery must be made for the ambulances. *Transcript page 181.* If not delivered on time, Re–Ace faces substantial economic penalties or fines for delay. *Transcript, page 31, lines 21–25.* In addition, Re–Ace is the party responsible for collecting monies to pay Wheeled Coach for the ambulances. It is evident to the Court that Re–Ace faces substantial risks in the relationship. *See Transcript, page 40, lines 1–18.* Also, if an order is placed with Wheeled Coach for an ambulance, and Re–Ace's client cancels the order, Re–Ace pays Wheeled Coach for that vehicle. That is what has happened in the past. *Transcript, page 32, lines 8–18.*

In the contractual relationship with Wheeled Coach, Re–Ace is the party who knows the Puerto Rico ambulance market. Mr. Leal testified that Re–Ace has provided to Wheeled Coach information regarding the Puerto Rico ambulance market, sales forecasts and market distribution by manufacturer. *Transcript, page 33, lines 3–20.*

During the last 24 years Re–Ace has created a substantial market for Wheeled Coach ambulances in Puerto Rico, estimated by Mr. Leal to be 50% of the total ambulance market in Puerto Rico. *Transcript, pages 33–34 (lines 1–5).* Before Re–Ace became its distributor in the island, Wheeled Coach had not sold one single ambulance in Puerto Rico. Wheeled

Coach has never had an office, facilities, or sales persons in Puerto Rico. *Transcript page 183.*

Moreover, Re–Ace, through its relationship with car dealers, is the party that has given publicity in Puerto Rico to Wheeled Coach's ambulances. *Transcript, pages 34–36, See also* plaintiff's *Exhibit 4.* Mr. Leal testified that he visits clients regularly, and talks to them on a daily basis. *Transcript, pages 34, lines 1–5.* Mr. Leal further declared that because of the years selling Wheeled Coach's products, Re–Ace is identified in Puerto Rico as Wheeled Coach's distributor and representative. *Transcript, page 35, lines 14–18.* In addition, Re–Ace has a sales force in Puerto Rico, acceptable to Wheeled Coach, for the sale and promotion of its ambulances in Puerto Rico. *Transcript, page 38, lines 13–25, page 39, lines 1–10.*

In sum, the evidence presented during the preliminary injunction hearing revealed that through its sole efforts, Re–Ace has established a market in Puerto Rico for Wheeled Coach's ambulances. Re–Ace has also complied with all of the terms and conditions of the exclusive distribution agreement executed in 1989. *Transcript, page 39, lines 11–25.* Re–Ace is also responsible to service and honor warranty claims with respect to Wheeled Coach's ambulances sold in Puerto Rico. *Transcript, page 40, lines 9–25, page 41, lines 1–15.*

Throughout the more than 24 years of relationship, as Wheeled Coach's exclusive distributor in Puerto Rico, Mr. Leal testified that Wheeled Coach never notified Re–Ace verbally or in writing that it had breached any of the terms of the contract dated 1989. *Transcript, page 41, lines 16–20.* According to Mr. Leal, Re–Ace has enhanced Wheeled Coach's business in Puerto Rico in a substantial manner through its own effort, service and dedication. *Transcript, page 41, lines 21–25, through page 44 (line 18).*

Furthermore, Wheeled Coach never changed the distribution contract with Re–Ace but, in the year 2002, it sent a new proposed contract to Re–Ace, substantially modifying the terms of the existing agreement, imposing sales quotas, making it non-exclusive and imposing a new applicable law and arbitration proceeding that was rejected by Re–Ace. Both parties continued doing business as before. *Transcript, pages 44–52.*

Wheeled Coach's only witness in the preliminary injunction hearing was Mr. Abel del Río. Mr. Del Río is the current International Sales Manager for Wheeled Coach and has been in that position since late in the year 2000. Mr. Del Río testified that Wheeled Coach paid Re–Ace a standard "commission" of $400.00 per ambulance. During his cross-examination, however, he admitted that in addition to that fee, which is a reimbursement to Mr. Leal, Re–Ace is paid by Wheeled Coach the excess between the sales price agreed by Re–Ace with its clients and the cost of the ambulance charged by Wheeled Coach. *Transcript pages 169–173.* Thus, Mr. Del Río's testimony confirmed Re–Ace's control over its profit. In addition, Mr. Del Río also testified that after it terminated its relationship with Re–Ace, Wheeled Coach entered into a Distribution Agreement with Bill de Leon Specialty Vehicles. *Transcript page 180.* He also testified that under said contract Bill de Leon Specialty Vehicles is the only Wheeled Coach distributor in Puerto Rico. *Transcript page 177.* He also testified that Bill de Leon Specialty Vehicles does not have any warehouse in Puerto Rico, does not have demonstrator vehicles, and does not have any service facilities for the ambulances. *Transcript pages 175–179.*

During the preliminary injunction hearing, Wheeled Coach Industries, Inc. did not question the validity of the 1989 written Distributor's Agreement with Re–Ace. In fact, it did not present any witness with knowledge of the relationship before late in the year 2000. In its memorandum filed with the Court, Wheeled Coach Industries, Inc. does not give any weight to that written agreement. Rather, it contends that Re–Ace is not a distributor protected by Act 75. Further, Wheeled Coach has implied that Re–Ace's poor sales record motivated Wheeled Coach's decision to terminate the agreement between the parties. However, Wheeled Coach did not present any evidence of formal correspondence or notice to Re–Ace to the effect that there existed grounds to terminate their commercial relationship.

## II. Analysis

The parties in this case do not dispute that the Puerto Rico Dealers Act, Act No. 75 of June 24, 1964, 10 P.R. Laws Ann. § 278 *et seq.* ("Act 75") is the statutory provision applicable to this case.[6] Considering this agreement and the case law on this subject, the Court agrees with the parties. Under Act 75, a dealer can seek equitable relief from the Court if it establishes that it is protected by the law and that its contract with a manufacturer has been unjustly terminated or that the manufacturer has acted in prejudice or detriment to an existing contract.

Act 75 provides certain public policy protections and safeguards for all distributors with the purpose of assuring that their relationships with manufacturers are carried out in good faith and not terminated without "just cause".

In addition, Act 75 confers upon the Court the authority to grant a preliminary injunction and any other provisional remedy deemed necessary to protect a dealer-manufacturer relationship against unjust terminations or of any act in detriment of the relationship ("menoscabo"). In pertinent part, Act 75 provides:

"In any litigation in which there is directly or indirectly involved the termination of a dealer's contract or any act in prejudice of the relation established between the principal or grantor and the dealer, the Court may grant, during the time the litigation is pending solution, any provisional remedy or measure of an interdictory nature to do or to desist from doing, ordering any of the parties, or both, to continue, in all its terms, the relation established by the dealer's contract, and/or to abstain from performing any act or any omission in prejudice thereof. In any case in which the provisional remedy herein provided is requested, the Court shall consider the interests of all parties concerned and the purpose of the public policy contained in this chapter." P.R. Laws Ann., tit. 10 § 278b–1.

■ Maintaining a dealership contract in force during the pendency of the litigation is meant to protect a *bona fide* dealer from the economic losses it stands to suffer once the contract is terminated. *See Systems de P.R., Inc. v. Interface Int., Inc.,* 123 D.P.R. 379 (1989).

Re–Ace's preliminary injunction request is based on its understanding that it has a right, as a dealer/distributor protected by Act 75, against Wheeled Coach's alleged

---

6. Courts presiding in a diversity jurisdiction case are bound to apply the substantive law, including the choice-of-law rules, of the forum where the action is filed. *Servicios Comerciales Andinos, S.A. v. GE Del Caribe,* 145 F.3d 463, 478 (1st Cir.1998); *Beatty Caribbean, Inc. v. Viskase Sales Corp.,* 241 F.Supp.2d 123, 128 (D.P.R.2003); Joseph W. Glannon, *Civil Procedure Examples and Explanations* 163–170 (4th ed.2001).

unjust and abrupt termination of the agreement between the parties.

In *Systema de Puerto Rico, Inc., supra,* the Supreme Court of Puerto Rico held that the purpose of the provisional remedy allowed by Act 75 is to protect a dealer from the economic losses it stands to suffer once its distribution contract is terminated. *See also Irvine v. Murad Skin Research Laboratories, Inc.,* 194 F.3d 313 (1st Cir.1999); *Euromotion, Inc. v. BMW of N. Am., Inc.,* 136 F.3d 866, 870 (1st Cir.1998); *Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.,* 96 F.3d 10, 14 (1st Cir.1996); *R.W. Intern., Corp. v. Welch Foods, Inc.,* 88 F.3d 49, 51 (1st Cir.1996). Courts, interpreting Act 75, have invariably quoted the following excerpt from the Statement of Motives of Act 75:

> "The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, concessionaires, or agents, as soon as these have created a favorable market and without taking into account their legitimate interests. The Legislative Assembly of Puerto Rico declares that the reasonable stability in the dealer's relationship in Puerto Rico is vital to the general economy of the [Commonwealth], to the public interest and to the general welfare, and in the exercise of its police power, it deems it necessary to regulate, insofar as pertinent, the field of said relationship, so as to avoid the abuse caused by certain practices." 18 Diario de Sesiones 1531 (1964).

The legislative reports to Act 75 also state that:

> "The problem with the dealership system in Puerto Rico has worsened as of late because of the ill-timed action of domestic and foreign manufacturers who, without just cause, terminate their relationship with their representatives or agents in Puerto Rico as soon as the latter have created a favorable market for their products, thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities.
>
> The traditional provisions which regulate contracts between the parties have shown their inefficacy in protecting the legitimate rights of the representative or agent, making it thus necessary to legislate in order to regulate this relationship and guarantee that manufacturers act in good faith, fairly, and not in an arbitrary manner, and to safeguard the rights and justified expectation of the representatives and agents inherent to the relationship. Furthermore, this will consequently stabilize the dealership relationships.
>
> This is the serious situation that we intend to remedy with the approval of this project..." Diario de Sesiones, *supra* at 1531.

Bearing this intent in mind, courts have invariably stated that "Act No. 75 unquestionably represents a strong public policy directed to level[ing] the contractual conditions between two groups financially unequal in their strength." *Medina & Medina v. Country Pride Foods, Ltd.,* 858 F.2d 817 (1st Cir.1988); *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64 (1983); *San Juan Merc. v. Canadian Transport Co.,* 108 D.P.R. 211, 216 (1978); *Walborg Corp. v. Tribunal Superior,* 104 D.P.R. 184, 189 (1975). Thus, in order to avoid the inequity of arbitrary termination of distribution relationships once the distributor has developed a local market for the principal's products or services, "Act 75 limits the principal's ability to unilaterally end the relationship except for 'just cause'" *Caribe Indus. Systems, Inc. v. Na-*

*tional Starch and Chemical Co.*, 212 F.3d 26 (1st Cir.2000).

■ The Court finds, based on the evidence presented during the preliminary injunction hearing, that Re–Ace is a distributor protected by Act 75. In *Triangle Trading Co., Inc. v. Robroy Industries, Inc.*, 200 F.3d 1, 4 (1st Cir.1999), the Court of Appeals for the First Circuit, in determining whether the plaintiff was a dealer, decided that the core factor to consider is "whether the dealer obtained a certain level of control over the distribution of the supplier's products in Puerto Rico." Furthermore, the First Circuit deferred to the opinion of the Supreme Court of Puerto Rico in *Roberco, Inc. & Colon v. Oxford Inds., Inc.*, 122 D.P.R. 115 (1988) which provides an inclusive list of factors to be weighed to determine whether a party has the requisite autonomy to be a dealer under Act 75.

In the present case, the nature and scope of Re–Ace's duties, in its relationship with Wheeled Coach, leads this Court to conclude that since 1979, it has performed the duties traditionally performed by a distributor, tempered to the particular product to be distributed, in this case, custom made ambulances.

■ Traditionally, courts have considered several factors to determine whether a distribution relationship exists between the parties. The Supreme Court of Puerto Rico has pointed to some of the aspects of a relationship that should be considered to determine whether a party is a distributor protected under Act 75. The main factors considered by the courts are as follows: (i) the nature of the contract between the parties and its title; (ii) who fixes the terms of the sales and the prices of products and who approves all sales orders; (iii) the location from where the distributor conducts his business; (iv) the existence of salespersons and the nature of their work; (vi) which party pays for the freight and storage of the merchandise; (vii) which party owns the merchandise and who is liable for its loss or destruction; (viii) whether the principal delivers the merchandise to the clients according to the orders furnished by the purported distributor, and, after delivery, to which party is the evidence of the delivery furnished; (ix) which party collects the payment for the products from the clients and how the payment process is carried out; and, (x) whether the purported distributor works for a fixed commission.

In *Cobos Liccia v. DeJean Packing Co., Inc.*, 124 D.P.R. 896 (1989), plaintiff filed an action for breach of a distribution agreement, seeking a preliminary injunction, as well as an award for damages against Dejean Packing Co., Plaintiff alleged that he was an exclusive dealer of DeJean's product line, which consisted of canned seafood, and that the termination of the contract was without just cause, in violation of the provisions of Act 75. After plaintiff succeeded at the trial court level, defendants filed a writ of certiorari in the Supreme Court, alleging that the trial court erred in awarding the injunction sought, by concluding that plaintiff was a dealer protected under Act 75. On appeal, the Supreme Court stated that in order to determine if plaintiff was a dealer protected under Act 75, an examination of plaintiffs' commercial operations was necessary, taken in conjunction with the contents of the contract executed between the parties, as well as the reality of how business was conducted between them. In order to decide whether plaintiff was an Act 75 distributor, the Supreme Court needed to consider the aforementioned aspects in light of the criteria outlined in *Roberco, supra*, 122 D.P.R. at 131–132. These criteria were: "...whether the 'distributor' performs an active promotion and/or closing of contracts; if he acquires inventory; if he exerts control over prices; if he

possesses the discretion to stipulate the terms of sales; if he is responsible for the delivery and charging of merchandise, and has the authority to grant credit; if he carries out efforts of publicity, be it independently or in connection with someone else; if he has assumed the risks and responsibility of his actions; if he buys the product, possesses the physical facilities and offers his clients services related with the product."

Regarding these criteria, which are inclusive factors, the Supreme Court of Puerto Rico stated that not all had to be satisfied in order to determine that a plaintiff is an Act 75 distributor. Instead, a trial court must consider said factors in light of the evidence presented. The trial Court must determine if that evidence is sufficient to help reach a conclusion that, given a preliminary injunction, there would be a possibility for plaintiff to succeed on the merits.

In *Cobos Liccia, supra,* the Court referred to the text of the contract between the parties, which stipulated that the acceptance and perfecting of sales orders fell exclusively upon defendants. Also referring to the contract, the Court confirmed that plaintiff did not have the authority to fix the merchandise's prices and that sales were conducted in conformity with the terms and conditions established exclusively by defendant. Furthermore, from the evidence gathered by the trial court, the Supreme Court concluded that plaintiff did

not acquire merchandise, nor did he keep an inventory; he did not have power to grant credit; he did not partake in publicity efforts. In fact, plaintiff Cobos failed to show that he fulfilled at least one of the criteria established in *Roberco, supra.* In said case the plaintiff did not prove, through the evidence presented at the hearing, that he was responsible neither for the risks of his empresarial maneuvering nor for the merchandise itself, nor that he owed any duty to third parties. He was, thus, not a distributor protected by Act 75.

The evidence presented in the preliminary injunction hearing before this Court makes this case markedly distinguishable from the *Cobos Liccia* scenario. In this case some of the uncontested aspects of Re–Ace's relationship with Wheeled Coach are as follows: (i) the contract between them was termed a 'Distributor's Contract'; (ii) Re–Ace exercised control over the prices of ambulances that are sold in Puerto Rico; (iii) in no part of the agreement does the same state that Wheeled Coach would be in charge of fixing the terms of the sales, the prices of products or that all orders were subject to their approval[7]; (iv) Re–Ace promotes and closes the sales contracts;[8] (v) Re–Ace is the party responsible for the collection of monies to pay Wheeled Coach for the cost of the ambulances; (vi) Re–Ace is the party responsible to its clients for the delivery of

---

7. The Court is not convinced of Wheeled Coach's argument that it controls, and not Re–Ace, the prices of the ambulances. It is evident that Re–Ace does not have any input in the price Wheeled Coach charges for its ambulances to Re–Ace. Yet, in the sale to its clients, it is Re–Ace who sets the final price for the ambulances, and includes its profit margin.

8. The Court, once again, is not moved by Wheeled Coach's argument that in its relationship with Ford, Wheeled Coach was the

seller of the unit and the Ford dealership was the buyer, hence Re–Ace cannot be an Act 75 distributor. Act No. 75, in Section 278(b), defines a dealer's contract as the: "Relationship established between a dealer and a principal or grantor *whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship,* the former actually and effectively takes charge of the distribution of a merchandise, or of rendering of a service, by concession or franchise, in the market of Puerto Rico" (emphasis added).

the ambulances; if not delivered on time, Re–Ace faces substantial economic penalties or fines for delay; (vii) other risks incurred by Re–Ace include that, if an order is placed with Wheeled Coach for an ambulance and Re–Ace's client cancels the order, Re–Ace pays Wheeled Coach for that vehicle; (viii) Re–Ace is also responsible to service and honor warranty claims by clients with respect to Wheeled Coach's ambulances sold in Puerto Rico; (ix) at times, Re–Ace purchased Wheeled Coach's ambulances for their sale in public bids; (x) Re–Ace conducted publicity by distributing promotional materials in connection with Wheeled Coach and corrected errors in materials provided by Wheeled Coach for distribution; (xi) Re–Ace produced letters of credit to Wheeled Coach before the ambulance left the manufacturing plant to Puerto Rico and, at times, used its own funds or the customer's funds to pay for the ambulance; (xii) Wheeled Coach has no contract for the sale of its ambulances in Puerto Rico with Re–Ace's clients directly; (xiii) Re–Ace does not keep an inventory of Wheeled Coach's vehicles in Puerto Rico to avoid paying an excise tax and given the custom nature of the ambulances sold; (xiv) Re–Ace has been in the business of distributing and selling different types of equipment, specialized trucks and ambulances since 1978; (xv) according to the Agreement, Re–Ace is, and has always been, as evidenced during the hearing, the exclusive distributor for Wheeled Coach in this principal market area; and (xvi) Re–Ace has created a substantial market for Wheeled Coach in Puerto Rico, estimated at 50% of the ambulance market in P.R.

The Court has analyzed Re–Ace's relationship with Wheeled Coach, taking into consideration the breadth of their commercial operations in conjunction with the contract stipulations, and coincides with Re–Ace's argument that its operations differ amply from plaintiffs' operations in *Cobos*

*Liccia,* and in turn fall within the scope of what a dealer is under Act 75 and prevailing jurisprudence. The Court reaffirms its consideration of Mr. Carlos Leal's testimony to reach this conclusion since he was the only person to testify with personal knowledge of the nature and extent of the relationship between Wheeled Coach and Re–Ace, which has existed for over twenty four (24) years.

■ Re–Ace satisfied most of the above-mentioned criteria, by virtue of the evidence presented, giving it a strong likelihood to succeed on the merits of the case. More so, it has presented several additional factors in support of its position.

As the Court stated in *Cobos Liccia, supra:* "A distribution agreement is characterized by its continuity, stability, mutual confidence and coordination between the parties in their capacity as independent promoters, without hierarchical subordination...". Also, "Act 75 is invested with great public interest. Its finality consists in 'leveling the trade conditions of two groups economically unequal in their force.' The law seeks to impede the empowerment by a principal of the accretion of a business after a local distributor has conquered a relevant market and a clientele solely through his efforts." *Id.* at 906.

This Court, thus, finds that Act 75 was drafted to protect distributors, like Re–Ace in this case, from the arbitrary and damaging decisions made by principals when they choose to terminate a relationship without just cause. In reaching this conclusion, the Court considers Act 75 jurisprudence stating that the temporary relief available under the Act "is not tied to a showing of irreparable injury or to the probability of success in a case on the merits, but rather to the policies of the [A]ct in promoting the continuation of dealership agreements and the strict adherence to the provisions of the agree-

ments." *Rosario v. Amana Refrigeration,* 733 F.2d 172 (1st Cir.1984); *DeMoss v. Kelly,* 493 F.2d 1012, 1015 (1st Cir.1974);*Medika Intern., Inc. v. Scanlan,* 830 F.Supp. 81, 88 (D.P.R.1993); *Aybar v. F & B. Mfg. Co., Inc.,* 498 F.Supp. 1184, 1191 (D.P.R.1980).

In addition, the Court concludes that Wheeled Coach failed to present any evidence justifying its decision to terminate the contract with Re-Ace, other than its contention that there was no contract in place between the parties. Yet, the 1989 Distributor's Contract was never terminated and the parties continued their commercial relationship even after its termination date. The evidence presented during the preliminary injunction hearing evidences that Wheeled Coach, when it decided to terminate the contract with Re-Ace, failed to mention any reason to terminate the agreement. It did not even have a copy of the written agreement between the parties. Thus, the Court concludes, based on the weight of the evidence presented during the preliminary injunction hearing, that, Wheeled Coach failed to demonstrate a just cause, as defined in Act 75, to terminate its contract with Re-Ace and the latter has a strong probability to succeed on the merits of this action.

### III. *Conclusion*

In accordance with the foregoing, the Court hereby **GRANTS** plaintiff's request for a preliminary injunction, and **ORDERS** the immediate reinstatement of the exclusive distribution agreement between Re-Ace and Wheeled Coach Industries, Inc. for the territory of Puerto Rico, under the same terms and conditions agreed upon and under which both parties have worked since 1979 until the termination of the agreement by Wheeled Coach Industries, Inc.. Considering the above, and the exclusive nature of the relationship with Re-Ace, the Court hereby **ENJOINS** De-fendant, Wheeled Coach Industries, Inc., from entering and/or maintaining any other distribution agreement with third parties for the territory of Puerto Rico.