EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Merchant Advance, LLC<br><br>Peticionaria<br><br>v.<br><br>Conceptos Cuisine, LLC h/n/c Pitipuá; Ángel D. Marrero Marrero, Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos<br><br>Recurridos | Certiorari<br><br>2026 TSPR 15<br><br>217 DPR ___ |

Número del Caso: CC-2025-0109

Fecha: 6 de febrero de 2026

Tribunal de Apelaciones

    Panel VIII

Representante legal de la parte peticionaria:

    Lcdo. Eduardo J. Corretjer Reyes

Materia: Obligaciones y Contratos; Ley de Transacciones Comerciales - Validez de un contrato de compraventa de ingresos futuros en nuestro ordenamiento jurídico; eficacia de las cláusulas de selección del derecho aplicable en un acuerdo cobijado por la Ley de Transacciones Comerciales.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Merchant Advance, LLC<br><br>        Peticionaria<br><br>            v.<br><br>Conceptos Cuisine, LLC h/n/c<br>Pitipuá; Ángel D. Marrero<br>Marrero, Fulana de Tal y la<br>Sociedad Legal de Gananciales<br>compuesta por ambos<br><br>        Recurridos | CC-2025-0109 | |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 6 de febrero de 2026.

En esta ocasión tenemos la oportunidad de aclarar si un Contrato de Compraventa de Ingresos Futuros —con una Cláusula de Selección de Ley en la que se escoge el derecho de Nueva York como el aplicable— puede ser ejecutado en Puerto Rico o si, por el contrario, se encuentra vedado por contravenir el orden público. Un análisis de la controversia a la luz de la normativa pertinente permite concluir que estos contratos son válidos en nuestro ordenamiento.

Veamos este caso en detalle.

I

El 20 de diciembre de 2019, Merchant Advance, LLC (Merchant o peticionaria)[1] presentó una *Demanda* en cobro de

---

[1] Merchant Advance, LLC (Merchant) es una compañía de responsabilidad limitada organizada bajo las leyes del Estado de Wyoming. No obstante,

dinero contra Conceptos Cuisine, LLC h/n/c Pitipuá (Conceptos),[2] el Sr. Ángel D. Marrero Marrero (señor Marrero Marrero) como presidente y dueño de la entidad, Fulana de Tal y la Sociedad Legal de Gananciales compuesta por estos últimos (en conjunto, recurridos). En síntesis, alegó que el 25 de julio de 2019 las partes formalizaron un contrato intitulado "*Agreement for the Purchase and Sale of Future Receipts*" (Contrato) mediante el cual Merchant le compró a Conceptos la cantidad de $34,750 en ingresos futuros por el precio de $25,000. Por su parte, Conceptos debía transferirle a Merchant —a una cuenta de banco previamente acordada— la cuantía diaria de $289.58 de los ingresos que generaran sus ventas hasta cubrir el precio de venta. El señor Marrero Marrero suscribió una garantía personal para asegurar el cumplimiento de las obligaciones que fueron asumidas por Conceptos. De la misma forma, Conceptos también concedió un gravamen mobiliario a favor de Merchant.

Merchant argumentó que, para efectos del Contrato, se consideraría incumplimiento el que Conceptos interfiriera con su derecho a recolectar la cuantía pactada. Expuso que, de así ocurrir, Merchant podría reclamar la totalidad de lo que faltara por cobrar, además de todos los gastos y

---

surge de los autos que la entidad está localizada en 132 West 36th Street, New York, New York 10018. Apéndice del *Certioari*, págs. 52, 85.

[2] Conceptos Cuisine, LLC h/n/c Pitipuá (Conceptos) es una compañía de responsabilidad limitada formada bajo las leyes de Puerto Rico, ubicada en Cupey Plaza, Carr. 176, Km 1.6, Ave. Víctor M. Labiosa, Local #PL5, San Juan, Puerto Rico 00926. Íd., pág. 51.

recargos que se adeudaran bajo el acuerdo. En esa línea, reclamó que Conceptos entorpeció su derecho a recobrar la suma acordada al cancelar la cuenta de banco donde se estaban realizando los pagos. Por lo cual, solicitó que se ordenara a los recurridos a pagarle: $20,560.58 en concepto de ingresos futuros no recibidos, $5,000 como penalidad por incumplimiento, $150 por la radicación del gravamen mobiliario y $8,687.50 en costas, gastos y honorarios de abogado.[3]

El 27 de diciembre de 2019, los recurridos fueron emplazados personalmente. Sin embargo, estos no comparecieron. Por tanto, el 30 de enero de 2020, Merchant presentó una *Solicitud de Anotación de Rebeldía y Sentencia*. El 5 de febrero de 2020, el Tribunal de Primera Instancia emitió y notificó una Orden mediante la cual le anotó la rebeldía a los recurridos. A su vez, le concedió un término a la peticionaria para que presentara un Memorando de Derecho en el que expusiera las bases legales del Contrato, de forma tal que el tribunal pudiera evaluar si el mismo era legal al amparo del derecho vigente en Puerto Rico.

En cumplimiento con lo ordenado, el 2 de marzo de 2020, Merchant presentó un *Memorando de Derecho y Argumentación*. A grandes rasgos, expuso que era una entidad dedicada a proveer capital líquido a pequeños y medianos

---

[3] Según se desprende de los Anejos de la *Demanda*, el 25 de octubre de 2019 Merchant hizo una reclamación extrajudicial a Conceptos y al Sr. Ángel D. Marrero Marrero, pero la misma resultó infructuosa. Íd., págs. 74-84.

comerciantes, adquiriendo a cambio un interés propietario sobre ingresos futuros hasta recibir la totalidad de la cuantía acordada. Señaló que, a pesar de que no es una práctica muy conocida en Puerto Rico, múltiples jurisdicciones de los Estados Unidos la han catalogado como una legítima al amparo del *Uniform Commercial Code* (UCC). Destacó que la controversia que otros tribunales han evaluado se ha centrado en definir si este tipo de transacción es un préstamo o no. Expuso que, en este caso, el Capítulo 9 de la Ley Núm. 208-1995, según enmendada, conocida como *Ley de Transacciones Comerciales*, 19 LPRA sec. 2211 *et seq.* (Ley Núm. 208-1995), contiene el marco jurídico aplicable a la relación contractual de autos. En ese sentido, arguyó que el Contrato se ajustaba a la definición de Contrato de Venta, la cual incluye tanto la venta actual de bienes, como la venta de bienes en el futuro. Por último, sostuvo que el acuerdo suscrito por las partes no era contrario a la ley, la moral o al orden público.

Así las cosas, el 17 de abril de 2020, el Tribunal de Primera Instancia notificó una Sentencia. En esta, concluyó que el cumplimiento del Contrato que se quería hacer valer no procedía, ya que iba en contra del derecho vigente en Puerto Rico. Explicó que, si bien la Ley Núm. 208-1995, *supra*, autorizaba los Contratos de Compraventa de Bienes a Futuro, el dinero no se consideraba un bien para efectos del estatuto. En ese aspecto, dispuso que en este caso se

estaba en realidad ante un Contrato de Préstamo con pactos de intereses usureros. Expresó que el Art. 1649 del Código Civil de 1930, 31 LPRA ant. sec. 4591, establecía que para un préstamo de más de $3,000, como el presente, los intereses no podían ser mayores a un ocho por ciento (8%). Por lo cual, amparándose en la sanción dispuesta en el Art. 1652 del Código Civil de 1930, 31 LPRA ant. sec. 4594, resolvió que Merchant solo tenía derecho a recuperar el setenta y cinco por ciento (75%) de la suma prestada, sin intereses, y que el veinticinco por ciento (25%) debía ser adjudicado al Gobierno de Puerto Rico. Por tal razón, ordenó a los recurridos a pagar la suma de $4,560 a la peticionaria y $6,250 al Estado. Al así hacerlo, tomó en consideración el hecho de que los pagos realizados por Conceptos al momento de presentarse la Demanda ascendían a $14,190.

Inconforme, Merchant acudió al Tribunal de Apelaciones mediante un recurso de apelación. En esencia, planteó que el foro primario erró al (1) determinar que el Contrato no era un acuerdo de compraventa de ingresos futuros, sino un préstamo y (2) que el mismo establecía intereses usureros, por lo que procedía limitar el recobro de lo adeudado al setenta y cinco por ciento (75%), sin intereses incluidos, y conceder el restante veinticinco por ciento (25%) al Estado.

El 27 de abril de 2021, el foro apelativo intermedio emitió una Sentencia a través de la cual confirmó al

Tribunal de Primera Instancia.[4] En su dictamen, indicó que no existía duda en torno a que el Contrato se regía y debía ser interpretado conforme a las leyes del Estado de Nueva York. Incluso, reconoció que el acuerdo en controversia era válidamente reconocido en esa jurisdicción y que la Ley Núm. 208-1995, *supra*, también contemplaba entre sus disposiciones la compraventa de ingresos futuros. Sin embargo, expresó que el estatuto local prohibía expresamente que el dinero fuese un bien objeto de este tipo de transacción. Por lo cual, entendió que este acto violentaba la ley de Puerto Rico, lo que ocasionaba que no produjera los efectos jurídicos que Merchant pretendía. Así pues, coincidió con el foro primario en que se trataba realmente de un Contrato de Préstamo y que, por tanto, procedía conceder los remedios otorgados en la Sentencia apelada. En cuanto al segundo señalamiento de error —dirigido a impugnar los presuntos intereses usureros por alegadamente tratarse de personas jurídicas las cuales, al amparo del Art. 12.09 de la Ley Núm. 164-2009, según enmendada, conocida como *Ley General de Corporaciones*, 14 LPRA sec. 3789 (Ley Núm. 164-2009) podían convenir cualquier tasa de interés— el foro apelativo intermedio decidió no atender el mismo por considerar que no se había argumentado ese asunto ante el Tribunal de Primera Instancia.

---

[4] Luego de que el Tribunal de Apelaciones les diera oportunidad a los apelados —aquí recurridos— para que comparecieran y se opusieran, sin que estos lo hicieran, dicho foro dio por perfeccionado el recurso y procedió a resolver.

Insatisfecha, Merchant presentó un recurso de *certiorari* ante este Tribunal (Caso Núm. CC-2021-0409). Tras expedir el auto, el 23 de octubre de 2023 notificamos una Sentencia en la cual revocamos la determinación del Tribunal de Apelaciones y devolvimos el caso a ese foro para que atendiera en los méritos el segundo señalamiento de error consignado por la peticionaria en su recurso de apelación.[5]

En consecuencia, el 14 de noviembre de 2024 el foro apelativo intermedio emitió otra Sentencia. En esta, reprodujo lo resuelto en su primera decisión a los fines de reiterar que la Ley Núm. 208-1995, *supra*, prohibía las transacciones de ventas a futuro cuyo objeto fuese el dinero y que, conforme a la ley vigente en Puerto Rico esa clase de acuerdo no surtía efectos. A su vez, confirmó que el Contrato en este caso era un préstamo. No obstante, razonó que, conforme al Art. 12.09 de la Ley Núm. 164-2009, *supra*, las partes, como corporaciones, podían convenir cualquier tasa de interés y estaban impedidas de plantear la defensa de usura. Por lo cual, concluyó que la tasa de treinta y nueve por ciento (39%) era lícita y que, por ende, procedía revocar la aplicación de la prohibición de usura, reinstalar la Demanda instada y devolver el asunto al Tribunal de Primera Instancia para que continuaran los procedimientos.

---

[5] En esa ocasión, los recurridos tampoco comparecieron ante este Tribunal.

Aún en desacuerdo, Merchant acudió ante nos mediante otro recurso de *certiorari* (Caso Núm. CC-2025-0109). Esta vez, planteó que el foro apelativo intermedió erró al: (1) reiterar los planteamientos emitidos en la primera Sentencia, pues la misma había sido revocada en su totalidad por este Foro previamente; (2) no reconocer que el Contrato de Compraventa de Ingresos Futuros es válido en nuestro ordenamiento jurídico y que no se trata de un Contrato de Préstamo simulado, y (3) no reconsiderar su dictamen.

Expedido el auto de *certiorari*, y habiendo concedido término a las partes para que presentaran sus alegatos, procedemos a resolver sin la comparecencia de los recurridos.

## II

### A. Los Contratos y las Cláusulas de Selección de Ley

En Puerto Rico predomina el principio de libertad de contratación. *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 15 (2017). Esto implica que la autonomía de la voluntad rige las relaciones contractuales. *Blanco Matos v. Colón Mulero*, 200 DPR 398, 407-408 (2018). Esta facultad al momento de contratar fue recogida en el Art. 1207 del Código Civil de 1930, el cual contempla que los contratantes establezcan "los pactos, cláusulas y condiciones que tengan por conveniente, **siempre que no sean contrarios a las leyes, a la moral, ni al orden público"**.

(Negrillas suplidas). 31 LPRA ant. sec. 3372.[6] La transgresión de alguno de estos elementos conlleva el efecto de que el contrato sea nulo y, por tanto, inexistente. *Pérez Rodríguez v. López Rodríguez et al.*, 210 DPR 163, 187 (2022); *De Jesús González v. A.C.*, 148 DPR 255, 264 (1999). Sobre el concepto de "orden público" hemos dispuesto que este:

> "puede definirse como el conjunto de valores eminentes que guían la existencia y el bienestar de una sociedad, que ampara un interés social dominante por los derechos que tiende a proteger. Por eso, es un medio para conseguir un balance entre la autonomía de la voluntad y la imprescindible protección del bienestar común". (Citas omitidas). *Pérez Rodríguez v. López Rodríguez et al.*, *supra*, págs. 187-188. Véase, además, *Luan Invest. Corp. v. Rexach Const. Co.*, 152 DPR 652, 659 (2000).

Las obligaciones que surjan como consecuencia de un contrato tienen fuerza de ley entre las partes por lo que estas vienen obligadas a cumplir con lo acordado. Art. 1044 del Código Civil de 1930, 31 LPRA ant. sec. 2994. Véase, *Bobé et al. v. UBS Financial Services*, *supra*, pág. 15; *Asoc. Res. Los Versalles v. Los Versailles*, 194 DPR 258, 266-267 (2015). Así pues, si se satisfacen las condiciones requeridas para que un contrato sea válido, los tribunales no pueden relevar a una parte de cumplir con la obligación que esta asumió.[7] *Bobé et al. v. UBS Financial Services*,

---

[6] Si bien el Código Civil de 1930 fue derogado al aprobarse el Código Civil de 2020, hacemos referencia al estatuto anterior por ser el aplicable a los hechos del caso. Véase, Art. 1812 del Código Civil de 2020, 31 LPRA sec. 1171.

[7] Los requisitos esenciales para la validez de un contrato son tres, a saber: (1) el consentimiento de los contratantes, (2) un objeto cierto y (3) causa para la obligación. Art. 1213 del Código Civil de 1930, 31

*supra*, pág. 15; *Asoc. Res. Los Versalles v. Los Versailles*, *supra*, pág. 267; *De Jesús González v. A.C.*, *supra*, pág. 271.

Entre las figuras contractuales comunes está el préstamo y la compraventa. Mediante el acuerdo de préstamo "una de las partes entrega a la otra […] dinero u otra cosa fungible, con condición de volver otro tanto de la misma especie y calidad". Art. 1631 del Código Civil de 1930, 31 LPRA ant. sec. 4511. Véase, además, Art. 1644 del Código Civil de 1930, 31 LPRA ant. sec. 4571.

Por otra parte, a través del Contrato de Compraventa "uno de los contratantes se obliga [a] entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente". Art. 1334 del Código Civil de 1930, 31 LPRA ant. sec. 3741. La venta se perfeccionará y será obligatoria para el vendedor y el comprador si estos hubieren logrado convenir sobre la cosa objeto del contrato y el precio, aunque ni una ni el otro se hayan entregado. Art. 1339 del Código Civil de 1930, 31 LPRA ant. sec 3746. Cabe señalar que "**el objeto de una compraventa puede ser** cosas corporales, incorporales o de **cosa futura**, siempre que recaiga en una cosa determinada en su especie y que se encuentre dentro del comercio de las personas". (Negrillas suplidas). *Bco. Popular v. Registrador*, 181 DPR 663, 672 (2011). Véase, además, L.E.

---

LPRA ant. sec. 3391. En cuanto a esto, "[l]os contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral". Art. 1227 del Código Civil de 1930, 31 LPRA ant. sec. 3432.

Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 6ta ed., Madrid, Ed. Tecnos, 1989, Vol. II., págs. 283-284; Arts. 1223 y 1225 del Código Civil de 1930, 31 LPRA ant. secs. 3421 & 3423.

Por otro lado, como parte de la potestad que tienen los contratantes de plasmar su voluntad e intención en los acuerdos que formalicen, se ha reconocido que estos también escojan cláusulas para determinar el foro o el derecho aplicable en casos de que surjan discrepancias.[8] *Bobé et al. v. UBS Financial Services*, *supra*, págs. 15-16. En lo pertinente a la controversia de autos, hemos dispuesto que "[l]as cláusulas en que se escoge la ley se consideran válidas usualmente cuando la jurisdicción seleccionada tiene contactos sustanciales con el contrato". *Unisys v. Ramallo Brothers*, 128 DPR 842, 855 (1991) (citando a *Walborg Corp. v. Tribunal Superior*, 104 DPR 184, 192 (1975)).[9] No obstante, **"[d]ichas cláusulas son ineficaces […] cuando chocan contra consideraciones fundamentales de orden público del foro"**. (Negrillas suplidas). Íd.

---

[8] Sobre las Cláusulas de Selección de Foro, véase: *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 15-19 (2017), y *Unisys v. Ramallo Brothers*, 128 DPR 842, 855-857 (1991).

[9] En *World Films, Inc. v. Paramount Pict. Corp.,* 125 DPR 352 (1990), revocamos la normativa pautada en *Walborg Corp. v. Tribunal Superior*, 104 DPR 184, 192 (1975), la cual establecía que no puede concedérsele a una Cláusula de Arbitraje mayor fuerza que a la política pública de protección a los distribuidores, representada por la Ley Núm. 75 de 24 de junio de 1964, según enmendada, conocida como *Ley sobre Contratos de Distribución de Puerto Rico*, 10 LPRA sec. 278 *et seq*. No obstante, ese dictamen en nada afectó lo expresado en *Walborg Corp. v. Tribunal Superior*, *supra*, sobre las cláusulas contractuales de selección de foro. Véase: *Unisys v. Ramallo Brothers*, *supra*, n. 3.

A su vez, en cuanto al poder de las partes de escoger el derecho aplicable a un acuerdo cobijado por la Ley Núm. 208-1995, *supra*, la Sección 1-105 de ese estatuto dispone que:

> **(1) Las partes podrán pactar el derecho que gobernará sus derechos y obligaciones, ya sea el de Puerto Rico o el de cualquier estado o nación.**
>
> (2) Cuando una de las siguientes disposiciones de este subtítulo especifique el derecho aplicable, esa disposición gobernará y un acuerdo contrario es válido solo en la medida que lo permita el derecho (incluyendo las reglas de conflictos de leyes) así especificado:
>
> […]
>
> (e) Secciones 2251 a 2257; La Ley que regirá la perfección, el efecto de la perfección o no perfección y la prioridad de garantías mobiliarias y gravámenes agrícolas. (Negrillas suplidas). 19 LPRA sec. 404.

**B. Los Intereses Usureros**

El Art. 1646 del Código Civil de 1930, 31 LPRA ant. sec. 4573, dispone que no se deberán intereses en un Contrato de Préstamo, excepto cuando expresamente se hayan pactado. De haberse acordado los mismos, existen normas que prohíben el cobro de intereses excesivos. Véanse Arts. 1649 al 1657 del Código Civil de 1930, 31 LPRA ant. secs. 4591-4599. Al respecto, el Art. 1649 del Código Civil de 1930, dispone que:

> A falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato será de seis dólares ($6) anuales sobre cada cien dólares ($100) o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto; **Disponiéndose, sin embargo, que no podrá fijarse un tipo de interés, por convenio especial, que sea mayor de nueve dólares ($9)**

anuales sobre cada cien dólares ($100) o sobre su equivalente en valor, cuando el capital objeto del préstamo o del convenio no exceda de $3,000 y de ocho dólares ($8) anuales por cada cien dólares ($100), cuando pase de dicha cantidad. Dentro de los límites que por este título se fijan, será legal descontar letras y pagarés y otras obligaciones análogas. (Negrillas suplidas). 31 LPRA ant. sec. 4591.[10]

En cuanto a las consecuencias de pactar intereses por encima de estos límites, el Art. 1652 del Código Civil de 1930 expone que:

Excepto como queda autorizado por la sec. 4593 de este título, **ninguna persona podrá exigir o recibir, directa o indirectamente, dinero o mercancías, a un tipo de interés mayor por el préstamo o la prórroga del préstamo de algún dinero, que el tipo fijado por las secs. 4591 a 4599 de este título.** Nada de lo contenido en este Capítulo se interpretará en el sentido de prohibir la venta de efectos al contado a un precio más bajo que al crédito.

**Ningún contrato en el cual se reserve, acepte o asegure, o se convenga en reservar, aceptar o asegurar, un tipo de interés mayor que el que se permite por las secs. 4591 a 4599 de este título, podrá hacerse efectivo en un tribunal de Puerto Rico, sino por el importe del capital adeudado; y el tribunal deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenta y cinco (75) por ciento de dicho capital y que el veinticinco (25) por ciento restante sea adjudicado y recobrado por el Estado Libre Asociado de Puerto Rico, quien podrá obtener mandamiento de ejecución, del mismo modo que el demandante, y sin preferencia sobre el montante adjudicado a éste, para hacer efectivo el veinticinco (25) por ciento así adjudicado.**

Los derechos definidos en esta sección no son renunciables. 31 LPRA ant. sec. 4594. (Negrillas suplidas).[11]

---

[10] Véase, además, lo dispuesto en la Ley Núm. 1 de 15 de octubre de 1973, según enmendada, conocida como *Ley para Fijar las Tasas de Intereses o Cargos Especiales para Distintas Transacciones Económicas*, 10 LPRA sec. 998 *et seq.*

[11] Hoy día, el Art. 1328 del Código Civil de 2020, establece, en lo pertinente, que:

Ahora bien, debe tenerse en cuenta que, al amparo del Art. 12.09 de la Ley Núm. 164-2009, *supra*, las corporaciones pueden contratar, tomar dinero a préstamo e incurrir en obligaciones a cualquier tasa de interés que estas consideren aceptables. En específico, dicha disposición establece que:

> **No obstante, cualquier limitación o penalidad establecida por ley, cualquier corporación que tome dinero a préstamo podrá contratar, incurrir en obligaciones y tomar dinero a préstamo, bien en el Estado Libre Asociado o en cualquier otro sitio, a cualquier tasa de interés que considere aceptable. Ningún deudor de esta clase, sea una corporación doméstica o una corporación foránea, podrá invocar estatuto alguno contra la usura en un procedimiento o en una acción legal establecida con el fin de obligar al pago o cumplimiento de cualquier obligación que surja de un préstamo de tal naturaleza, esté o no la obligación representada por cualquier bono, pagaré, contrato u otro escrito firmado, asumido o garantizado por tal deudor o cualquier sucesor o cesionario del mismo. En tal virtud, no se castigará como delito el exigir o recibir intereses a cualquier tasa así convenida ni podrá interponerse, por razón de usura, recurso alguno para recobrar cantidad alguna pagada en exceso del interés máximo fijado por ley o para hacer efectiva cualquier otra penalidad civil.** (Negrillas suplidas). 14 LPRA sec. 3789. Véase, además, C.E. Díaz Olivo, *Corporaciones: tratado sobre derecho corporativo*, 2da ed. rev., Ed. AlmaForte, 2022, págs. 456-457.

De conformidad con el Art. 12.39 de la Ley Núm. 164-2009, 14 LPRA sec. 3984, **lo anterior también es aplicable a las compañías de responsabilidad limitada.** Además, una

---

"Es nula la cláusula contractual que obliga a una persona natural al pago de intereses mayores a los que disponen las leyes, los reglamentos y las órdenes administrativas. La nulidad da lugar a que sólo pueda cobrarse el setenta y cinco por ciento (75%) de la deuda principal. El restante veinticinco por ciento (25%) se paga al Secretario de Hacienda. No se deberán intereses, sino cuando expresamente se hubiesen pactado". 31 LPRA sec. 10085.

persona natural que garantice como fiador un préstamo hecho a una corporación tampoco puede invocar para sí la defensa de usura. Véase, Díaz Olivo, *op. cit.*, pág. 457; *Mansiones P. Gardens, Inc. v. Scotiabank*, 114 DPR 513, 520 (1983).

## C. Los Contratos de Compraventa de Ingresos Futuros o "Merchant Cash Advance"

Los Contratos de Compraventa de Ingresos Futuros (conocidos como "*Purchase and Sale of Future Receipts Agreement*" o "*Merchant Cash Advance*", en inglés) son un tipo de financiamiento utilizado mayormente por negocios pequeños. Véase, Adam J. Levitin, *Predatory Small-Business Lending: Market and Regulatory Failures*, 42 Yale J. on Reg. 732, 754-755 (2025), y Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 No. 4 Bankruptcy Law Letter NL 1 (2022).[12] Su existencia data de al menos finales del siglo veinte, pero su popularidad surgió tras la crisis financiera del 2008 debido al endurecimiento de los criterios para conceder préstamos. Íd.

Esta clase de acuerdo tiende a ser por cuantías menores a las disponibles a través de préstamos comerciales, pero a un costo superior. Levitin, *supra*, pág. 758. Sin embargo, a diferencia de un préstamo, este producto: (1) suele ser más fácil de obtener; (2) es más accesible para empresas pequeñas con historial crediticio pobre o limitado; (3) generalmente no tiene límites en

---

[12] Véase, además, J.F. Hilson & S.L. Sepinuck, *A "Sale" of future receivables: disguising a secured Loan as a purchase of hope*, 9 Transactional Law. 14 (2019).

torno a cómo pueden utilizarse los fondos, y (4) tiene una estructura de pago distinta a la que normalmente provee un préstamo. Íd., págs. 758-760.

En un acuerdo como este, una parte compra a descuento **los ingresos que la otra recibirá en el futuro de las cuentas por cobrar que genere o de las ventas que realice**. Íd., pág. 755; Bruce, *supra*. Es decir, a cambio de recibir una suma de dinero descontada, fija e inmediata, la parte que vende sus ingresos futuros se compromete a transferirle a la parte compradora un por ciento de estos diariamente hasta lograr satisfacer el precio pactado. Íd. De ordinario, este contrato se respalda por un gravamen mobiliario y una garantía personal. Levitin, *supra*, pág. 758; Bruce, *supra.*

### D. El *Uniform Commercial Code* y sus Comentarios Oficiales

El Código Uniforme de Comercio (*Uniform Commercial Code*) es un modelo de reglas uniformadas y predeterminadas propuestas para regir las transacciones comerciales y simplificar los negocios interestatales.[13] Se trata de un texto legal recomendado, redactado por el American Law Institute (ALI) y la Uniform Law Comission (ULC), el cual los estados han adoptado en parte, con modificaciones o totalmente.[14]

---

[13] Uniform Commercial Code (UCC), Westlaw Practical Law Glossary, https://next.westlaw.com/Document/I03f4db00eee311e28578f7ccc38dcbee/View/FullText.html?transitionType=Default&contextData=(sc.Default), (última visita, 16 de octubre de 2025).

[14] Íd. Centraremos nuestro análisis en la versión del Artículo 9 del Código Uniforme de Comercio, con las enmiendas del 2010 y su respectivo Comentario Oficial, por ser la utilizada por Nueva York y Puerto Rico para aprobar los estatutos pertinentes a la controversia

El Artículo 9 del Código Uniforme de Comercio ——sobre transacciones garantizadas— **aplica tanto a las transacciones en las que cuentas o pagos intangibles garanticen una deuda,** <u>como a la venta directa de una cuenta o de un pago intangible</u>. No obstante, este deja en manos de los tribunales el trazar los criterios para distinguir entre una transacción y otra.

En cuanto a lo anterior, la Sec. 9-109(a)(3) del Código Uniforme de Comercio dispone que: "(*a) [General scope of article.] Except as otherwise provided in subsections (c) and (d),* <u>***this article applies to***</u>*: […] (3)* **a** <u>**sale of accounts**</u>*, chattel paper,* **payment intangibles***, or promissory notes*"]. (Negrillas y subrayado suplidos). Por su parte, los Comentarios Oficiales al Código Uniforme de Comercio añaden sobre esto lo siguiente:

> **Under subsection (a)(3), as under former Section 9-102, this Article applies to sales of accounts** and chattel paper. **This approach generally has been successful in avoiding difficult problems of distinguishing between transactions in which a receivable secures an obligation and** <u>**those in which the receivable has been sold outright**</u>**. In many commercial financing transactions the distinction is blurred.**
>
> **Subsection (a)(3) expands the scope of this Article by including the sale of a "payment intangible" (defined in Section 9-102 as "a general intangible under which the account debtor's principal obligation is a monetary obligation")** and a "promissory note" (also defined in Section 9-102). **To a considerable extent, this Article affords these transactions treatment identical to that given sales of accounts** and chattel paper. In some respects, however, sales of payment intangibles and

---

de autos. Véase, Unif. Commercial Code Art. 9 (1972)(1999)(2010), Refs. & Annos.

promissory notes are treated differently from sales of other receivables. See, e.g., Sections 9-309 (automatic perfection upon attachment), 9-408 (effect of restrictions on assignment). By virtue of the expanded definition of "account" (defined in Section 9-102), this Article now covers sales of (and other security interests in) "health-care-insurance receivables" (also defined in Section 9-102). **Although this Article occasionally distinguishes between outright sales of receivables and sales that secure an obligation, neither this Article nor the definition of "security interest" (Section 1-201(37)) delineates how a particular transaction is to be classified. <u>That issue is left to the courts</u>**. (Negrillas y subrayado suplidos). Comentarios Oficiales a la Sec. 9-109 del Código Uniforme de Comercio modelo.

**E. Nueva York - Adopción del Artículo 9 del _Uniform Commercial Code_ y los Criterios Jurisprudenciales para distinguir entre Préstamos Garantizados y Contratos de Compraventa de Ingresos Futuros**

Las disposiciones propuestas en el Artículo 9 del Código Uniforme de Comercio han sido adoptadas por el Estado de Nueva York.[15] En esa línea, los tribunales estatales de esa jurisdicción han concluido que los **"[p]urchases and sales of future receivables and sales proceeds are common commercial transactions expressly contemplated by the Uniform Commercial Code"**.[16] (Negrillas suplidas). _Rapid Capital Fin., LLC v. Natures Mkt. Corp._, 57 Misc. 3d 979, 982, 66 N.Y.S.3d 797, 799 (Sup. Ct. Westchester County 2017) (citando a _IBIS Capital Group, LLC_

---

[15] Véase, F.C. Amendola _et al._, _Overview of Article 9 of Uniform Commercial Code as adopted in New York_, New York Jurisprudence (2da Ed.), 95 N.Y. Jur. 2d Secured Transactions sec. 1 (2025).

[16] Véase, además, _Womack v. Capital Stack, LLC_, 2019 WL 4142740, pág. 7 (S.D. N.Y. 2019) (decisión que sustenta su dictamen en una serie de 28 casos estatales y federales en el estado de Nueva York las cuales caracterizaban las transacciones de "_Merchant Cash Advance_" como ventas).

*v. Four Paws Orlando LLC*, 2017 N.Y. Slip Op. 30477(U), 2017 WL 1065071 (Sup. Ct. Nassau County 2017)).

Por lo general, los tribunales del Estado de Nueva York sopesan tres (3) factores al determinar si una transacción es un préstamo garantizado o una compraventa de ingresos futuros. Véase, *Fleetwood Services, LLC v. Richmond Capital Group LLC*, No. 22-1885-CV, 2023 WL 3882697, pág. 2 (2d Cir. 2023); *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666, 122 N.Y.S.3d 309, 312 (2d Dep't 2020); *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 57 N.Y.S.3d 625, 632-634 (Sup. Ct. Westchester County 2017).[17] <u>Primero</u>, evalúan si existe una Cláusula de Conciliación en el acuerdo. Este tipo de disposición permite que el vendedor solicite un ajuste en las cuantías que paga diariamente por razón de una reducción o un aumento en sus ingresos. Si una transacción cuenta con un pacto de conciliación es probable que se trate de una compraventa de ingresos futuros. <u>Segundo</u>, examinan si el acuerdo posee un plazo definido para su cumplimiento. Un plazo definido para el reembolso de la suma anticipada sugiere que se trata de un préstamo. Por el contrario, un plazo indefinido es consistente con una compraventa de ingresos futuros, en donde el término para recobrar las cuantías acordadas se podría ver afectado por el volumen de ingresos que genere el vendedor. <u>Tercero</u>,

---

[17] Véase, además, E.M. Bosek *et al.*, *Applicability of usury laws to assignment of wages, accounts receivable, and rents*, New York Jurisprudence (2da Ed.), 72 N.Y. Jur. 2d Interest and Usury sec. 79 (2025).

consideran si existe un remedio en caso de que el vendedor se acoja a un procedimiento de quiebra. Una disposición en la que se otorgue, en estos escenarios, el derecho a exigir de inmediato el pago de la suma adelantada o la facultad de ejecutar las garantías personales pactadas sería indicadora de que el negocio jurídico objeto de evaluación es un préstamo.

En Nueva York, la importancia de la distinción entre una compraventa de ingresos futuros y un préstamo garantizado recae en que a estos últimos les aplican las leyes de usura.[18]

**F. Puerto Rico - Ley de Transacciones Comerciales**

La Ley Núm. 208-1995, *supra*, fue promulgada en Puerto Rico con el propósito de: (1) simplificar, clarificar y modernizar el derecho que rige las transacciones comerciales; (2) permitir la continua expansión de prácticas comerciales por medio de las costumbres, los usos y los acuerdos entre las partes, y (3) uniformar el derecho entre las diversas jurisdicciones. Sección 1-102(2) de la Ley Núm. 208-1995, 19 LPRA sec. 401. En ese aspecto, a menos que sean desplazados por disposiciones particulares de este estatuto, los principios generales del derecho aplican a modo supletorio. Sección 1-103 de la Ley Núm. 208-1995, 19 LPRA sec. 402. Además, con el objetivo de

---

[18] J.F. Hilson & S.L. Sepinuck, *A "sale" of future receivables: criminal usury in another form*, 9 Transactional Law 1, pág. 2 (2019); Bosek, *supra*. ["Corporations are generally ineligible to raise a defense based on civil usury, although they can raise a defense based on criminal usury".]

adelantar los fines y la política fundamental recogida en la Ley Núm. 208-1995, *supra*, sus disposiciones deben ser interpretadas y aplicadas liberalmente. Art. 1-102(1) de la Ley Núm. 208-1995, *supra*.

En esencia, la Ley Núm. 208-1995, *supra*, se deriva de los artículos modelos del Código Uniforme de Comercio. *Cruz Consulting v. El Legado et al.*, 191 DPR 499, 509 (2014). Ahora bien, mediante la Ley Núm. 21-2012 (2012 [Parte 1] Leyes de Puerto Rico 273) se añadió un nuevo Capítulo 9 y se enmendaron varias secciones de la Ley Núm. 208-1995, *supra*, en aras de estar a la vanguardia de los adelantos comerciales y establecer normas mercantiles lo más uniforme a las de los demás Estados. Exposición de Motivos de la Ley Núm. 21-2012, *supra*. La adopción de este estatuto tuvo como fin **aumentar el margen prestatario y las oportunidades de financiamiento para los pequeños y medianos comerciantes en Puerto Rico**. Íd.

En la Exposición de Motivos de la Ley Núm. 21-2012, *supra*, la Asamblea Legislativa hizo constar, además, lo siguiente:

> [E]sta legislación tendrá el efecto de modernizar y actualizar la Ley de Transacciones Comerciales basado en las experiencias y el conocimiento de múltiples fuentes, para beneficio de nuestro desarrollo económico. Las principales fuentes para la investigación e interpretación de las disposiciones del Código Uniforme de Comercio modelo incluyendo el Artículo 9 son las siguientes: (1) el propio Código Uniforme de Comercio modelo; (2) los comentarios oficiales a cada sección de cada artículo del Código Uniforme de Comercio modelo preparados por el Instituto de Derecho Americano y la Conferencia Nacional de Comisionados sobre Leyes Estatales Uniformes; (3)

los comentarios de la Junta Editorial Permanente del Código Uniforme de Comercio (PEB); y (4) las decisiones judiciales federales y estatales de las jurisdicciones que interpretan y aplican el Código Uniforme de Comercio conforme ha sido promulgado en cada estado particular. **Además del texto del propio Código Uniforme de Comercio modelo, los comentarios oficiales son casi universalmente tratados como las fuentes de autoridad en la construcción de las Secciones del UCC. Los comentarios oficiales explican el propósito e intención de cada sección, y los cambios al artículo anterior del Código Uniforme de Comercio modelo, y son rutinariamente utilizados por los tribunales al interpretar las disposiciones, y esto Puerto Rico no debe ser la excepción, pues Puerto Rico está completamente integrado al comercio del resto de los Estados Unidos, y nuestros tribunales deben hacer lo propio.** (Negrillas suplidas).

Por su parte, en cuanto al alcance y la aplicación del Capítulo 9 sobre transacciones garantizadas, la Sección 9-109 de la Ley Núm. 208-1995, 19 LPRA sec. 2219, dispone que:

> **(a) Alcance general del capítulo.-Salvo por lo dispuesto en los incisos (c) y (d) de esta sección, este capítulo aplicará a:**
>
> […]
>
> (3) **una <u>venta de cuentas</u>**, papel financiero, **pago <u>intangible</u>**, o pagarés […] (Negrillas y subrayado suplido).

La Sección 9-102 de la Ley Núm. 208-1995, 19 LPRA sec. 2212, incluyó al respecto las definiciones siguientes:

> **(2) Cuenta.**-Excepto según se use en el contexto de 'rendir cuentas', **significa un derecho al pago de <u>una obligación monetaria</u>, haya sido tal derecho devengado o no por el cumplimiento, (i) por propiedad que haya sido o será vendida, arrendada, con licencia, cedida o de otro modo transferida, (ii) por servicios prestados o a ser prestados,** (iii) por una póliza de seguro emitida o a ser emitida, (iv) por una obligación accesoria incurrida o a ser incurrida, (v) por energía provista o a ser provista, (vi) por el uso o alquiler de un buque bajo un contrato de

fletamento u otro contrato, (vii) que surja del uso de una tarjeta de crédito o tarjeta de cargos o información contenida en o para el uso con la tarjeta, o (viii) como ganancias en una lotería u otro juego de azar operado o auspiciado por un estado, entidad gubernamental de un estado o persona con licencia o autorizada para operar el juego por el estado o entidad gubernamental de un estado. El término incluye cuentas a cobrar bajo contratos de seguros de salud. El término no incluye (i) derechos a pago evidenciados por papel financiero o un instrumento, (ii) una reclamación en daños y perjuicios comerciales, (iii) cuentas de depósito, (iv) inversiones, (v) derechos sobre cartas de crédito o cartas de crédito o (vi) derechos a pago por dinero o fondos adelantados o vendidos, que no sean derechos que surjan del uso de una tarjeta de crédito o de tarjeta de cargos o información contenida en o para uso con la tarjeta.

[…]

**(61) Pago intangible.-Significa un bien incorporal bajo el cual la obligación principal del deudor de la cuenta es una <u>obligación pecuniaria</u>**. (Negrillas y subrayado suplidos).

En lo pertinente a este último término, señalamos que la Sección 9-102 de la Ley Núm. 208-1995, *supra*, define "bienes incorporales" como:

"cualquier bien mueble, incluyendo cosas en acción, que no sean cuentas, papel financiero, reclamaciones en daños y perjuicios comerciales, cuentas de depósito, documentos, bienes, instrumentos, inversiones, derechos sobre cartas de crédito, cartas de crédito, pólizas de seguro, dinero, y petróleo, gas u otros minerales antes de su extracción. **El término incluye pagos intangibles** y programas de computadoras". (Negrillas y subrayado suplidos).

Expuesto el marco jurídico aplicable, pasemos a resolver.

## III

En su recurso de *certiorari*, Merchant alega, en síntesis, que los foros inferiores erraron al: (1) no

respetar la Cláusula del Contrato que dispone que el mismo debe ser interpretado al amparo de la ley de Nueva York; (2) concluir que la compraventa de ingresos futuros contraviene la ley en Puerto Rico, y (3) decidir que el acuerdo pactado es en realidad un préstamo. La peticionaria entiende que en este caso no se dan los elementos para invalidar la disposición de selección de ley acordada. Esto pues, considera que la jurisdicción seleccionada tiene contactos sustanciales con el Contrato, por ser su lugar principal de negocios. De igual forma, argumenta que no se transgreden consideraciones fundamentales de orden público en Puerto Rico, debido a que tanto el Código Civil como la Ley Núm. 208-1995, *supra*, contemplan y permiten este tipo de acuerdo.

Luego de analizar detenidamente este asunto, entendemos que le asiste la razón a la compareciente. Veamos.

De manera inicial, debemos precisar cuál es la ley que aplica al presente Contrato. Según Merchant, el acuerdo debe ser interpretado a la luz del derecho del Estado de Nueva York, por haber sido ese el pacto entre las partes. Sobre el particular, subrayamos que las Cláusulas del Contrato fueron redactadas tanto en inglés como en español. En cuanto al derecho aplicable, la Cláusula 20 establece, en inglés, que: "This Agreement shall be governed by and construed in accordance with the laws of the **state of New York**, without regards to any applicable principals of

conflicts of law".[19] (Negrillas suplidas). No obstante, en español, la disposición lee de la manera siguiente: "Este Contrato será interpretado de acuerdo [con] las leyes del **Estado Libre Asociado de Puerto Rico**, sin consideración de los principios aplicables de conflicto de leyes".[20] (Negrillas suplidas). Como es evidente, existe una discrepancia entre ambas secciones. No obstante, un examen del Contrato refleja que en la Cláusula 29 se contempló una solución ante la posibilidad de que hubiese alguna contradicción en el convenio. En específico, en esta se hizo constar que:

> 29. Prevailing Language. In the event of any inconsistencies between the English provisions and the Spanish provisions of this Agreement, **the provisions in the English language shall be controlling** and the Spanish language provisions hereof shall be subject and subordinate to those in English.
>
> 29. Lenguaje que Prevalece. En la eventualidad de cualquier inconsistencia entre les disposiciones en inglés y las disposiciones en español en este Contrato, **las disposiciones en inglés regirán y controlarán** y las disposiciones en español estará[n] sujetas y subordinadas a las disposiciones en inglés.[21] (Negrillas suplidas).

Por lo cual, según lo expuesto, debemos entender que el interés de las partes era que la ley del Estado de Nueva York rigiera el Contrato.[22] Superada esa interrogante,

---

[19] Apéndice del *Certiorari*, pág. 62.

[20] Íd.

[21] Íd., pág. 64.

[22] En el Contrato, las partes incluyeron una Cláusula de Selección de Foro, la cual dispone que: "Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be Instituted in any court

corresponde examinar si a la luz de los criterios de esa jurisdicción el acuerdo en cuestión cumple con los requisitos para considerarse una compraventa de ingresos futuros o si, por el contrario, se trata en realidad de un préstamo garantizado. Para ello, debemos ponderar, primero, si se incluyó una Cláusula de Conciliación en el acuerdo. En esa línea, observamos que la Cláusula 2 del Contrato dispone que:

> **2. Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, **Seller may request that Buyer adjust the Daily Amount** to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer **to assist in this reconciliation.** No more often than once a month, **Buyer may adjust the Daily Amount on a going-forward basis** to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.[23] (Negrillas suplidas).

De lo citado se desprende que las sumas cobradas diariamente por Merchant podían ser ajustadas para que reflejaran los ingresos recibidos por Conceptos. Ante ello, resulta evidente que una Cláusula de Conciliación sí fue pactada.

---

sitting in the **Commonwealth of Puerto Rico".** (Negrillas suplidas). Íd., pág. 62.

[23] Íd., pág. 53.

Lo próximo a determinar es si el Contrato es por término definido o indefinido. Al respecto, la Cláusula 4 del acuerdo, intitulada **"Sale of Future Receipts (THIS IS NOT A LOAN)"**, establece que: "There is no interest rate or payment schedule and **no time period during which the Purchased Amount must be collected by Buyer**".[24] (Negrillas suplidas). Conforme a este inciso, no existía un plazo específico para que Merchant recobrara la suma acordada, lo que implica que la obligación tenía un término indeterminado.

Como último punto, debemos evaluar si el comprador tenía algún remedio disponible en caso de que el vendedor se declarara en quiebra. Sobre esto, surge de la Cláusula 4 que:

> […] If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted **because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement.** Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. […][25] (Negrillas suplidas).

Así pues, si Conceptos cesaba operaciones o se iba a quiebra, este no adeudaría suma alguna a Merchant. Es

---

[24] Íd., pág. 54.
[25] Íd.

decir, la peticionaria proveyó liquidez económica inmediata a Conceptos a cambio de una participación en sus ventas futuras con el riesgo de perder su inversión si la empresa dejaba de operar o se declaraba en bancarrota. Aun cuando la Cláusula 16 del Contrato vislumbraba que Merchant pudiera exigir el cumplimiento con la Garantía Personal y ejercer sus derechos como acreedor asegurado bajo la Ley Núm. 208-1995, *supra*, ello estaba atado a la ocurrencia de los eventos de incumplimiento contemplados en la Cláusula 15, entre los cuales no figuraban el cese de operaciones o la quiebra del negocio.

En vista de lo anterior, nos parece apropiado concluir que el Contrato objeto de este caso fue estructurado como una compraventa de ingresos futuros y no como un préstamo. Ahora bien, corresponde que examinemos si esta transacción contraviene los criterios aplicables a las Cláusulas de Selección de Ley, de modo que no pueda ser ejecutada en Puerto Rico.

Como mencionamos previamente, el primer factor a considerar es si la jurisdicción seleccionada tiene contactos sustanciales con el acuerdo. En este caso, no existe disputa en cuanto a esto. Incluso, del expediente surge que las operaciones de Merchant están localizadas en el Estado de Nueva York, jurisdicción cuyas leyes fueron seleccionadas por las partes para que aplicaran en caso de desacuerdo.[26] Empero, lo que sí está controvertido es el

---

[26] Íd., págs. 52, 85.

segundo criterio dirigido a precisar si la compraventa de ingresos futuros violenta o no el orden público en Puerto Rico.

Tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones concluyeron que sí. Expresaron que, en este foro, los Contratos de Compraventa de Ingresos Futuros o *Merchant Cash Advance* están prohibidos por la Ley Núm. 208-1995, *supra*. Razonaron que, si bien el estatuto define un "Contrato de Venta" como un acuerdo que "incluye tanto la venta actual de bienes al igual que un contrato para vender los bienes en el futuro", dentro de la definición de "bienes" se excluye el "dinero".[27] Sin

---

[27] La Sección 9-102 de la Ley Núm. 208-1995, según enmendada, conocida como *Ley de Transacciones Comerciales* (Ley Núm. 208-1995), expone que "Contrato de Venta" "[i]ncluye tanto la venta actual de bienes al igual que un contrato para vender los bienes en el futuro". Por su parte, "bienes":

> "[s]ignifica todas las cosas movible[s] cuando se constituye una garantía mobiliaria. El término incluye (i) bienes inmuebles por su destino, (ii) madera en pie que será cortada y removida bajo una transferencia o contrato de venta, (iii) las crías por nacer de animales, (iv) cosechas cultivadas, creciendo o a sembrarse, aun si las cosechas se producen en árboles, en una vid o en arbustos, y (v) casas prefabricadas. El término incluye un programa de computadora integrado en los bienes y cualquier información de apoyo provista en relación con una transacción relacionada al programa si: (i) el programa está asociado con los bienes de tal modo que por costumbre se considera parte de los bienes, o (ii) haciéndose dueño de los bienes, una persona adquiere un derecho a usar el programa con relación a los bienes. El término no incluye un programa de computadora integrado en bienes que son solamente el medio en el cual el programa está integrado. El término tampoco incluye cuentas, papel financiero, reclamaciones en daños y perjuicios comerciales, cuentas de depósito, documentos, bienes incorporales, instrumentos, inversiones, derechos sobre cartas de crédito, cartas de crédito, dinero, petróleo, gas u otros minerales antes de su extracción". 19 LPRA sec. 2212.

Por otro lado, según la Sección 1-201 de la Ley Núm. 208-1995, *supra*, "dinero" significa: "un medio de cambio autorizado o adoptado por un gobierno doméstico o extranjero e incluye una unidad de cuenta

embargo, el problema con dicho análisis recae en que no toma en cuenta que en acuerdos como el presente el "dinero" no es la cosa objeto del negocio. Por el contrario, lo que se compra y vende es una "cuenta" o un "pago intangible" mediante el cual se transfiere el derecho a obtener el cumplimiento de una obligación monetaria posteriormente. En ese sentido, se trata de un **derecho contractual a recibir dinero en el futuro**, lo que no es lo mismo que el **dinero en sí**.[28]

Por otra parte, los foros inferiores tampoco consideraron que el Capítulo 9 de la Ley Núm. 208-1995, *supra* ——proveniente del Artículo 9 del Código Uniforme Comercial—— aplica tanto a la venta directa de una cuenta como a la de un pago intangible. Así lo reconoce el propio Código Uniforme Comercial y su Comentario Oficial el cual, por mandato legislativo, debe ser la herramienta que se utilice para interpretar la Ley Núm. 208-1995, *supra*. Por tanto, lejos de prohibir este tipo de transacción, la Ley Núm. 208-1995, *supra*, la contempla y la regula. De igual forma, el Código Civil autoriza que sean objeto de los acuerdos las cosas determinadas que no estén fuera del

---

monetaria establecida por una organización intergubernamental o por acuerdo entre dos (2) o más naciones". 19 LPRA sec. 451.

[28] Véase, a modo ilustrativo, lo dispuesto en *In re 3PL4PL, LLC*, 619 B.R. 441, 464 (Bankr. D. Col. 2020) (citando a *In re Vienna Park Properties*, 976 F.2d 106, 116 (2d Cir. 1996) ["*A contractual right to obtain money at some future time is not the same thing as the money itself*".]

comercio, incluyendo las **futuras**.[29] En vista de esto, y tomando en consideración que al amparo de la Ley Núm. 164-2009, *supra*, estamos ante un contrato al que no le aplican las protecciones de usura por Conceptos ser una entidad organizada bajo ese estatuto, no existen razones para concluir que un Contrato de Compraventa de Ingresos Futuros esté vedado en Puerto Rico por razón de infringir el orden público.

## IV

Por los fundamentos antes expuestos, se revoca aquella parte de la Sentencia emitida por el Tribunal de Apelaciones en la que se concluye que la transacción comercial entre Merchant y Conceptos es un Contrato de Préstamo. De acuerdo con la intención de las partes, este acuerdo trata en realidad de un Contrato de Compraventa de Ingresos Futuros ejecutable en Puerto Rico por no violentar el orden público. Así las cosas, se confirman las demás determinaciones realizadas por el foro apelativo intermedio. Se reinstala la Demanda de la peticionaria y se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos de acuerdo con lo aquí resuelto.

Se dictará Sentencia en conformidad.

Mildred G. Pabón Charneco
Jueza Asociada

---

[29] Al igual que el Código Civil de 1930, el Código Civil de 2020 también permite esto. Véase, Arts. 269 y 1244 del Código Civil de 2020, 31 LPRA secs. 3161 & 9791.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Merchant Advance, LLC<br><br>    Peticionaria<br><br>        v.<br><br>Conceptos Cuisine, LLC h/n/c<br>Pitipuá; Ángel D. Marrero<br>Marrero, Fulana de Tal y la<br>Sociedad Legal de Gananciales<br>compuesta por ambos<br><br>    Recurridos | CC-2025-0109 | |

SENTENCIA

En San Juan, Puerto Rico, a 6 de febrero de 2026.

Por los fundamentos expuestos en la Opinión que antecede, se revoca aquella parte de la Sentencia emitida por el Tribunal de Apelaciones en la que se concluye que la transacción comercial entre Merchant y Conceptos es un Contrato de Préstamo. De acuerdo con la intención de las partes, este acuerdo trata en realidad de un Contrato de Compraventa de Ingresos Futuros ejecutable en Puerto Rico por no violentar el orden público. Así las cosas, se confirman las demás determinaciones realizadas por el foro apelativo intermedio. Se reinstala la Demanda de la peticionaria y se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos de acuerdo con lo aquí resuelto.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez disiente con Opinión escrita a la cual se une el Juez Asociado señor Colón Pérez.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Merchant Advance, LLC

    Peticionaria

       v.

Conceptos Cuisine, LLC h/n/c Pitipuá; Ángel D. Marrero Marrero y Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos

    Recurridos

CC-2025-0109

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente a la cual se une el Juez Asociado señor Colón Pérez

En San Juan, Puerto Rico a 6 de febrero de 2026.

De manera errónea, una mayoría de este Tribunal decreta la validez de un contrato de compraventa sobre ingresos futuros a pesar de lo estatuido en el ordenamiento jurídico vigente. En particular, avala una cláusula de selección de foros que permite autorizar un acuerdo contractual que la *Ley de Transacciones Comerciales*, Ley Núm. 208-1995, según enmendada, 19 LPRA sec. 401 *et seq.* (Ley Núm. 208- 1995) prohíbe de manera expresa. Por entender que este tipo de contrato vulnera nuestro orden público, respetuosamente disiento.

**I.**

El 20 de diciembre de 2019 Merchant Advance, LLC

(Merchant)[1] presentó una *Demanda* en cobro de dinero contra Conceptos Cuisine, LLC h/n/c Pitipuá (Conceptos) y el Sr. Ángel D. Marrero Marrero como presidente de la entidad. En síntesis, Merchant alegó que el 25 de julio de 2019 las partes formalizaron un contrato intitulado "*Agreement for the Purchase and Sale of Future Receipts*" (Contrato). Mediante el Contrato, Merchant le compró a Conceptos la cantidad de $34,750 en ingresos futuros por el precio de $25,000.[2] Por su parte, Conceptos debía transferirle a Merchant la cuantía diaria de $289.58 de los ingresos que generara hasta cubrir la cantidad acordada, a saber, $34,750.[3]

Merchant argumentó que Conceptos interfirió con su derecho de recobro al cancelar y/o desautorizar la cuenta de la cual Merchant retiraba la cuantía acordada. A tales efectos, solicitó que se ordenara el pago de $20,560.58 en concepto de ingresos futuros no recibidos, $5,000 como penalidad por incumplimiento, $150 por la radicación del gravamen mobiliario y $8,687.50 en costas, gastos y honorarios de abogado.

Luego de varios trámites procesales, el Tribunal de Primera Instancia emitió y notificó un *Orden* mediante la

---

[1] Mercahnt Advance, LLC(Merchant) es una entidad dedicada a proveer capital líquido a pequeños y medianos comerciantes, adquiriendo a cambio de un interés propietario sobre ingresos futuros hasta recibir la totalidad de la cuantía acordada.
[2] Para una ganancia de 39%.
[3] La Opinión mayoritaria sostiene que, mediante el Contrato, Merchant "compró a Conceptos la cantidad de $34,750 en ingresos futuros por el precio de $25,000. Por su parte, Conceptos debía transferirle a Merchant [...] la cuantía diaria de $289.58 de los ingresos que generan sus ventas hasta cubrir el precio de venta". Opinión mayoritaria, pág. 2. Según redactado, se pudiera interpretar que la cantidad adeudada es $25,000, no obstante, esto no es correcto.

cual le anotó la rebeldía a Conceptos. Posteriormente, el foro primario emitió una *Sentencia* mediante la cual declaró no ha lugar la *Demanda*. Concluyó que el Contrato era nulo pues estaba en contravención con el derecho vigente en Puerto Rico. **Explicó que, si bien es cierto que la Ley Núm. 208- 1995 autoriza los contratos de compraventa de bienes futuros, el dinero no se consideraba un bien para efectos del estatuto.** A la luz de lo anterior, el Tribunal de Primera Instancia determinó que el Contrato en realidad era un préstamo con pacto de intereses usureros. Por lo que, Merchant solo tenía derecho a recuperar el 75% de la suma prestada, sin interés, y que el 25% debía adjudicarse al Estado Libre Asociado de Puerto Rico.

Inconforme con la determinación del foro primario, Merchant acudió al Tribunal de Apelaciones y alegó que estábamos ante un contrato de ingresos futuros y no un contrato de préstamo, por lo cual no procedía limitar el recobro por intereses usureros.

El foro apelativo emitió una *Sentencia* mediante la cual confirmó la determinación del Tribunal de Primera Instancia. Expuso que no cabía duda de que el Contrato se regía por las leyes del estado de Nueva York; sin embargo, sostuvo que la Ley Núm. 208-1995 prohibía expresamente que el dinero fuese un bien objeto de este tipo de transacción, por lo cual el contrato era nulo. Ahora bien, el Tribunal de Apelaciones decidió no atender el segundo error en cuanto a la impugnación de intereses usureros por entender que el Contrato se suscribió entre personas jurídicas, las cuales podían acordar

cualquier tasa de interés que entendieran conveniente al amparo del Artículo 12.09 de la Ley Núm. 164-2009, según enmendada, *Ley General de Corporaciones*, 14 LPRA sec. 3789.

Insatisfecho con la determinación del foro apelativo, Merchant compareció ante nos mediante un recurso de *certiorari* (CC-2021-0409). En aquella ocasión, tras expedir el recurso, este Tribunal quedo igualmente dividido en cuanto al curso de acción, por lo que nos abstuvimos de emitir un pronunciamiento sobre a la validez de los contratos de compraventa sobre ingresos futuros en Puerto Rico. Así, el 23 de octubre de 2023 notificamos una *Sentencia* mediante la cual revocamos la determinación del foro apelativo y devolvimos el caso a ese mismo foro para que atendiera en los méritos el segundo señalamiento de error, a saber, la procedencia de intereses usureros en cuanto a personas jurídicas.

Luego de varios trámites procesales, el Tribunal de Apelaciones emitió otra *Sentencia* mediante la cual reiteró sus planteamientos en cuanto a la nulidad del Contrato conforme a la ley vigente en Puerto Rico. Asimismo, confirmó que estábamos ante un contrato de préstamo. No obstante, sostuvo que, por virtud de la Ley Núm. 164-2009, las partes podían convenir cualquier tasa de interés que estimaran conveniente. A tales efectos, el foro apelativo intermedio concluyó que el Contrato era uno de préstamo, pero que la tasa de interés de 39% era lícita.

Aún inconforme con la determinación, Merchant acudió ante nos mediante el recurso de *certiorari* que nos ocupa.

## II.

### A. La teoría general de contratos

El Artículo 1042 del Código Civil de 1930 (derogado) dispone que "las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitas o en que intervenga cualquier género de culpa o negligencia". 31 LPRA ant. sec. 2992.[4] En el caso de las obligaciones que nacen de un contrato, estas tienen fuerza de ley entre las partes contratantes. 31 LPRA ant. sec. 2994. Ahora bien, aun cuando no esté en controversia la existencia del vínculo contractual, pueden surgir instancias en las cuales el contrato adolezca de nulidad relativa o nulidad radical. Rosario Rosado v. Pagán Santiago, 196 DPR 180, 187 (2016).

Por virtud de la libertad contractual, las partes pueden "establecer los pactos, cláusulas y condiciones que tengan por conveniente, **siempre que no sean contrarios a las leyes, a la moral, ni al orden público**". (Negrilla y subrayado suplidos). 31 LPRA ant. sec. 3372. A modo que, si un contrato se opusiere a las leyes o la moral, o lesionare un interés del orden público, sería un contrato con causa ilícita que **no produce efecto alguno**. (Negrilla y subrayado suplidos). 31 LPRA ant. sec. 3432; BPPR v. Sucn. Talavera, 174 DPR 686, 693 (2008).

En lo pertinente, hemos definido el orden público como

---

[4] Se hace referencia al Código Civil del 1930 (derogado), por ser este ser el aplicable a los hechos del presente caso.

"el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad[;] [...] recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger".(Citas omitidas).<u>Luan Invest. v. Rexach Const. Co.</u>, 152 DPR 652, 659 (2000). Por tanto, se hace necesario reiterar que:

> Independientemente del tipo de contrato de que se trate y de la importancia que [e]ste merezca para las partes contratantes, es nulo y, por lo tanto, inexistente un contrato que resulte contrario a las leyes, a la moral o al orden público. En tales casos de nulidad, incluso una parte que se haya beneficiado del contrato en cuestión puede impugnarlo por ser contrario a la ley, a la moral o al orden público. (Citas omitidas). <u>De Jesús González v. AC</u>, 148 DPR 255, 263-264 (1999).

**B. Las cláusulas de selección de foro**

La Sección 1-105(1) de la Ley Núm. 208-1995, establece que "[l]as partes podrán pactar el derecho que gobernará sus derechos y obligaciones, ya sea el de Puerto Rico o el de cualquier estado o nación". 19 LPRA sec. 404. Lo anterior está sujeto a ciertas disposiciones contenidas en la ley que especifican el derecho aplicable y que se recogen en el inciso (2) de la referida sección. <u>Íd</u>. Cónsono con lo anterior, y al amparo del principio de la libertad contractual, las partes pueden pactar cláusulas de selección de foro, esto para "establecer cuál será el foro donde se atenderán las disputas posibles que puedan surgir de la relación contractual entre las partes". <u>Bobé et al. v. UBS Fin. Servs.</u>, 198 DPR 6, 15- 16, (2017).

No obstante, estas cláusulas, al igual que el resto del contrato, quedan sujetas a las normas generales de los

contratos. A saber, no pueden contravenir la ley, la moral o el orden público so pena de nulidad. 31 LPRA ant. sec. 3372. Como norma general, las cláusulas de selección de foro son válidas cuando la jurisdicción seleccionada tiene contactos sustanciales con el contrato. Unisys v. Ramallo Brothers, 128 DPR 842, 855 (1991). No obstante, dichas clausulas se consideran ineficaces cuando chocan con consideraciones fundamentales de orden público del foro. (Citas omitidas). Walborg Corp. v. Tribunal Superior, 104 DPR 184, 192 (1975).

### C. El contrato de ingresos futuros

El contrato de compraventa de ingresos futuros (también conocido como *merchant cash advance*) es una transacción estructurada como una compra a descuento de cuentas por cobrar o ingresos por devengarse. J. Hilson & S. Sepinuck, *A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope*, 9 Trans. Law. 14, 15-16 (2019). A modo que, una parte vende a descuento sus ingresos futuros a otra parte a cambio de recibir una cantidad fija e inmediata. Se denomina una compra a descuento porque la parte compradora le entrega a la parte vendedora una cantidad de dinero menor que la que recibe. A la misma vez, quien 'vende' se compromete a pagar un porciento de los ingresos que reciba a diario al acreedor. Aunque la forma en que se hace el pago puede variar, el hecho de que este se realice a diario es uno de los elementos distintivos de este tipo de transacción. *Véase*, a modo de ejemplo, In re Hill, 589 B.R. 614, 619, 66 Bankr. Ct. Dec. (CRR) 65 (Bankr. N.D. I11. 2018).

El artículo de revista jurídica *The Murky Process of Characterizing Merchant Cash Advance Agreements*, el cual la Opinión mayoritaria cita con aprobación, dispone que el pago bajo el esquema propuesto en el contrato de ingresos futuros es satisfecho "from whtever **moneys** the merchant has available". (Negrilla y subrayado suplidos). *Véase* K. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 No. 4 Bankrupcy Law Letter NL 1.

### D. La Ley de Transacciones Comerciales

La Ley Núm. 208-1995 se creó con tres propósitos fundamentales: (1) simplificar, clarificar y modernizar el derecho que rige las transacciones comerciales; (2) permitir la continua expansión de prácticas comerciales por medio de las costumbres, los usos y los acuerdos entre las partes, y (3) uniformar el derecho entre las diversas jurisdicciones. 19 LPRA sec. 401(2). Por ello, expresa que "se interpretará y aplicará liberalmente para promover sus propósitos y políticas fundamentales". Íd., sec. 401(1). Dispone que, "[a] menos que sean desplazados por disposiciones particulares de [esta ley], los principios generales de derecho de esta jurisdicción aplicarán de modo supletorio". 19 LPRA sec. 402. Asimismo, "estos principios generales de derecho incluyen de forma muy especial las normas del Código de Comercio que subsisten después de la aprobación de la Ley Núm. 208-1995, y las normas del Derecho Civil". M.R. Garay Aubán, *Derecho cambiario de Estados Unidos y Puerto Rico*, Ponce, Ed. Rev. Der. Pur., 1999, pág. 28.

En cuanto a la estructura de la Ley Núm. 208-1995, en su Capítulo 1, el estatuto contiene definiciones generales y principios de interpretación que aplicarán a la totalidad del texto. No obstante, lo allí dispuesto estará sujeto a las definiciones adicionales contenidas en los capítulos subsiguientes de la ley. 19 LPRA sec. 451.

En lo pertinente, el inciso (24) de la Sección 1-201 de la Ley Núm. 208-1995 dispone que *dinero* "significa un medio de cambio autorizado o adoptado por un gobierno doméstico o extranjero e incluye una unidad de cuenta monetaria establecida por una organización intergubernamental o por acuerdo entre dos o más naciones". Íd. También, dispone que el término *compra* incluye una adquisición mediante **venta, descuento, negociación, gravamen** o garantía mobiliaria, entre otros. (Negrilla suplida). Íd.

En lo concerniente al caso de autos, la Sec. 9-102(d)(11) expresa que el contrato de venta "[i]ncluye tanto la venta actual de bienes al igual que un contrato para vender los bienes en el futuro". 19 LPRA sec. 2212. Ahora bien, la propia Ley Núm. 208-1995 aclara qué constituye un *bien* para estos efectos:

> significa todas las cosas movible[s] cuando se constituye una garantía mobiliaria. El término incluye (i) bienes inmuebles por su destino, (ii) madera en pie que será cortada y removida bajo una transferencia o contrato de venta, (iii) las crías por nacer de animales, (iv) cosechas cultivadas, creciendo o a sembrarse, aun si las cosechas se producen en árboles, en una vid o en arbustos, y (v) casas prefabricadas. El término incluye un programa de computadora integrado en los bienes y cualquier información de apoyo provista en relación con una transacción relacionada al programa si: (i) el programa está asociado con los bienes de tal modo que por costumbre se considera parte de los bienes, o (ii) haciéndose dueño de los bienes, una persona adquiere un derecho a usar el programa con relación a los bienes. **El término no incluye un programa de computadora integrado en bienes que son solamente el medio**

**en el cual el programa está integrado. El término tampoco incluye cuentas, papel financiero, reclamaciones en daños y perjuicios comerciales, cuentas de depósito, documentos, bienes incorporales, instrumentos, inversiones, derechos sobre cartas de crédito, cartas de crédito, <u>dinero</u>, petróleo, gas u otros minerales antes de su extracción.** (Negrilla y subrayado suplidos). 19 LPRA sec. 2212.

### III.

La mayoría concluye que no se dan las condiciones para invalidar el Contrato pues el mismo no transgrede consideraciones fundamentales de orden público. Arriba a esta conclusión por entender que ni el Código Civil de Puerto Rico ni la Ley Núm. 208-1995 prohíben este tipo de acuerdo. En particular, plantea que en el caso de autos la cosa objeto del negocio no es el dinero sino un pago intangible mediante el cual se transfiere el derecho a obtener el cumplimiento de una obligación monetaria posteriormente. A tales efectos, dispone que el Contrato versa sobre "un **derecho contractual a recibir dinero en el futuro,** lo que no es lo mismo que el **dinero en sí**".[5] Lo anterior no me convence, máxime cuando, según el Contrato, Merchant queda facultado para retirar el **dinero** a la medida que ingrese al patrimonio de Conceptos.

Ahora bien, la Opinión mayoritaria determina acertadamente que la transacción contenida en el Contrato sobre la compra de ingresos futuros debe evaluarse a la luz de la Ley Núm. 208- 1995. Es necesario reconocer que la Ley Núm. 208- 1995 admite la posibilidad de suscribir un contrato de venta sobre bienes actuales y futuros. No obstante, para determinar qué constituye un bien susceptible a este tipo de transacción, correspondía circunscribirnos a

---

[5] Opinión mayoritaria, en la pág. 30.

las definiciones que provee la Ley Núm. 208-1995. Así, este estatuto excluye expresamente, entre otros, las cuentas, el papel financiero, las cuentas de depósito y **el dinero**. 19 LPRA sec. 2212.

Según se desprende del Contrato, Conceptos se obligó a vender, asignar y transferir a Merchant lo siguiente:

> [T]he Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount. "Future Receipts" includes **all payments made by cash**, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or **other form of monetary payment** in the ordinary course of Seller's business. (Bastardillas en el original). (Negrilla suplida).[6]

De una lectura de la referida cláusula se desprende que las partes constituyeron un gravamen sobre un bien prohibido, a saber, **el dinero** que pudiera entrar a las cuentas de Conceptos. Esto implica que, contrario a la contención de Merchant, la Ley Núm. 208-1995 no contempla el Contrato como un negocio jurídico legítimo.

Al evaluar la transacción comprendida en el Contrato, es inevitable concluir que esta se encuentra en conflicto no tan solo con la Ley Núm. 208-1995, sino que también contraviene el amplio andamiaje regulatorio que rige en nuestra jurisdicción (particularmente, el sector financiero) y la normativa que rige la usura.[7] Por virtud del contrato de

---

[6] Apéndice del recurso, pág. 55.
[7] Nuestro ordenamiento jurídico repudia el pacto de intereses usureros. Por virtud del Artículo 1652 del Código Civil de 1930, 31 LPRA ant. sec. 4594 se estableció lo siguiente:

> **Ningún contrato en el cual se reserve, acepte o asegure, o se convenga en reservar, aceptar o asegurar, un tipo de interés mayor que el que se permite por este Capítulo, podrá hacerse efectivo en un tribunal de Puerto Rico, sino por el importe del capital adeudado; y el tribunal deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenta y cinco**

compraventa de ingresos futuros, una parte adquiere un interés sobre el dinero de la otra a la medida que esta última los vaya generando. Asimismo, dada la amplitud del objeto del contrato, queda meridianamente claro que el riesgo que asume la parte acreedora es mínimo, lo que hace todavía menos justificable la alta tasa de interés que tiende a respaldar este tipo de contrato, en este caso una ganancia de 39%. Por ende, validar un contrato de esta naturaleza crearía un subterfugio para aquellos individuos que pretendan eludir las normas de usura, las cuales se adoptaron precisamente con el interés de proteger a la parte deudora necesitada del cobro excesivo de intereses. Monclova v. Financial Credit Corp., 83 DPR 770, 784 (1961).

De otra parte, las cláusulas de selección de foro se han reconocido en nuestro ordenamiento jurídico, a modo que se presumen válidas excepto en aquellas instancias en que choquen con el orden público. Walborg Corp. v. Tribunal Superior, *supra*, pág. 192. En el caso de marras, el Contrato contiene una cláusula de selección de foro que establece que la ley que regirá el Contrato será aquella del estado de Nueva York. A pesar de ser una práctica aceptada tanto por este

---

**(75) por ciento de dicho capital y que el veinticinco (25) por ciento restante sea adjudicado y recobrado por el Estado Libre Asociado de Puerto Rico**, quien podrá obtener mandamiento de ejecución, del mismo modo que el demandante, y sin preferencia sobre el montante adjudicado a [e]ste, para hacer efectivo el veinticinco (25) por ciento así adjudicado. **Los derechos definidos en esta sección no son renunciables**. (Negrilla y subrayado suplidos).

Es sabido que estas normas responden "al deseo de proteger al prestatario necesitado, que no tiene más alternativa ante su desamparo y urgencia que aceptar las condiciones que le imponga el prestamista". Monclova v. Financial Credit Corp., 83 DPR 770, 784 (1961).

Tribunal como por la Ley Núm. 208-1995, la implantación de esta cláusula derrotaría la política pública pues validaría un acuerdo contractual, permitido en Nueva York, que contraviene la legislación local y el orden público puertorriqueño.

Por todo lo anterior, es inevitable concluir que el Contrato, según pactado, se encuentra en conflicto directo con las leyes aplicables, y, por consiguiente, es nulo *ab initio*. Sostener su validez constituye un craso menosprecio a la normativa que reglamenta los acuerdos contractuales en Puerto Rico. Resalto que la libertad contractual no es absoluta y queda supeditada a que los contractos no infrinjan la ley, la moral o el orden público.

Asimismo, al analizar las disposiciones y las definiciones anteriores, junto con la sustancia del negocio acordado entre Merchant y Conceptos, me veo imposibilitada de avalar una cláusula de selección de foro que transgrede la Ley Núm. 208-1995, la política pública y el orden público. Ello así, pues autorizar la cláusula de selección de foro y, consecuentemente, adoptar el contrato de ingresos futuros en nuestro ordenamiento jurídico contraviene las disposiciones que excluyen el dinero y las cuentas como bienes sujetos a compra futura.

Por los fundamentos expuestos, los foros inferiores tenían el deber ineludible de decretar la nulidad del Contrato y ordenar la devolución de las contraprestaciones según

dispone el Código Civil de 1930. En vista de que la mayoría resuelve de forma distinta, respetuosamente disiento.


                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta